1  KENDALL BRILL & KLIEGER LLP
   Robert N. Klieger (192962)
2    *rklieger@kbkfirm.com*
   Joshua M. Rodin (224523)
3    *jrodin@kbkfirm.com*
   10100 Santa Monica Blvd., Suite 1725
4  Los Angeles, California  90067
   Telephone: 310.556.2700
5  Facsimile:  310.556.2705

6  HUSCH BLACKWELL SANDERS LLP
   Alan S. Nemes (admitted *pro hac vice*)
7    *alan.nemes@huschblackwell.com*
   190 Carondelet Plaza, Suite 600
8  St. Louis, Missouri  63105
   Telephone: 314.345.6461
9  Facsimile:  314.480.1505

10 Attorneys for Defendant and Counterclaimant
   Electronic Arts Inc. and Counterclaimant
11 EA Digital Illusions CE AB

12                  UNITED STATES DISTRICT COURT

13      NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

14

15 EDGE GAMES, INC., a California corporation,    Case No. 10-CV-2614-WHA

16              Plaintiff,                         **DEFENDANT ELECTRONIC ARTS INC.'S**
                                                   **MEMORANDUM IN OPPOSITION TO**
17          v.                                     **PLAINTIFF EDGE GAMES, INC.'S**
                                                   **MOTION FOR PRELIMINARY**
18 ELECTRONIC ARTS INC., a Delaware              **INJUNCTION**
   corporation,
19                                                 [Declarations of Walter Eliot Bard, James Binns,
              Defendant.                           Jonathan Correa, Lincoln Hershberger, Robert N.
20                                                 Klieger, and Jacob Schatz; and Request for
                                                   Judicial Notice filed concurrently herewith]
21 ELECTRONIC ARTS INC., a Delaware
   corporation; and EA DIGITAL ILLUSIONS CE      Date:      September 30, 2010
22 AB, a Swedish corporation,                     Time:      8:00 a.m.
                                                   Crtrm.:  9
23              Counterclaimants,
                                                   Hon. William H. Alsup
24          v.
                                                   Complaint Filed:  June 15, 2010
25 EDGE GAMES, INC., a California corporation;
   and THE EDGE INTERACTIVE MEDIA, INC.
26 a California corporation,

27              Counterdefendants.

28

Kendall Brill
& Klieger LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

56826.1                                                           10-CV-2614-WHA

# TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................ 1

II.    FACTUAL BACKGROUND ............................................................................... 2

    A.    EA's *Mirror's Edge* Video Game ........................................................... 2

    B.    Plaintiff's Delay In Filing Suit And Moving For Provisional Relief ...................... 4

III.   ARGUMENT ....................................................................................................... 5

    A.    Plaintiff Cannot Demonstrate A Likelihood Of Success On The Merits ................. 6

        1.    Plaintiff's Purported Marks Are Not Valid ................................................. 6

            (a)   Plaintiff Obtained, Maintained, And/Or Renewed At Least Five Of The Registrations Through Fraud ........................................ 7

                (i)     THE EDGE (Reg. No. 3,559,342) ......................................... 7

                (ii)    GAMER'S EDGE (Reg. No. 3,381,826) .............................. 9

                (iii)   EDGE (Reg. No. 2,219,837) ................................................. 9

                (iv)    EDGE (Reg. No. 3,105,816) ................................................. 10

                (v)     CUTTING EDGE (Reg. No. 2,251,584) ............................... 11

            (b)   At Least Three Of The Registrations Are Void *Ab Initio* ............... 12

                (i)     THE EDGE (Reg. No. 3,559,342) ......................................... 12

                (ii)    GAMER'S EDGE (Reg. No. 3,381,826) .............................. 12

                (iii)   EDGE (Reg. No. 3,105,816) ................................................. 14

            (c)   Each Of Plaintiff's Purported Marks Has Been Abandoned ........... 14

         2.    Plaintiff Cannot Demonstrate A Likelihood Of Confusion ...................... 16

            (a)   Plaintiff Does Not Own A "Family" Of Marks ............................. 16

            (b)   The *Sleekcraft* Factors Heavily Favor EA ..................................... 18

                (i)     Plaintiff's Marks Are Weak .................................................. 19

                (ii)    Plaintiff's And EA's Marks Are Not Confusingly Similar ................................................................................... 21

                (iii)   Plaintiff And EA Use Different Marketing Channels ......... 22

                (iv)    There Is No Evidence Of Actual Confusion ....................... 23

Kendall Brill
& Klieger LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

56826.1

i

10-CV-2614-WHA

1                              (v)        The Remaining Factors Also Favor EA .............................. 23

2            B.        Plaintiff Cannot Demonstrate Irreparable Harm ...................................... 24

3            C.        The Balance Of Hardships Favors EA .................................................... 25

4            D.        The Public Interest Will Be Harmed If An Injunction Issues ................................ 25

5    **IV.        CONCLUSION..............................................................................................................25**

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Kendall Brill**
**& Klieger LLP**
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

# **TABLE OF AUTHORITIES**

## **Cases**

A& H Sportswear, Inc. v. Victoria's Secret Stores, Inc.,
237 F.3d 198 (3d Cir. 2000) ................................................................. 18

Advanced Rotocraft Tech. v. L-3 Comms. Corp.,
2007 WL 437682 ................................................................................. 25

Advertise.com, Inc. v. AOL Advertising, Inc.,
__ F.3d __, 2010 WL 3001980 (9th Cir. 2010) ..................................... 6

AM Gen. Corp. v. DaimlerChrysler Corp.,
311 F.3d 796 (7th Cir. 2002) ................................................... 16, 17, 18

Aurora World, Inc. v. Ty Inc.,
2009 WL 6617192 (C.D. Cal. Dec. 15, 2009) ...................................... 25

Au-Tomotive Gold, Inc. v. Volkswagen of Am., Inc.,
457 F.3d 1062 (9th Cir. 2006) ............................................................. 16

Aycock Engn'g, Inc. v. Airflite, Inc.,
560 F.3d 1350 (Fed. Cir. 2009) ........................................................... 12

Barcamerica Int'l USA Trust v. Tyfield Importers, Inc.,
289 F.3d 589 (9th Cir. 2002) ............................................................... 16

Brookfield Comms., Inc. v. W. Coast Entm't Corp.,
174 F.3d 1036 n.19 (9th Cir. 1999) ..................................................... 19

Carter-Wallace, Inc. v. Procter & Gamble Co.,
434 F.2d 794 (9th Cir. 1970) ............................................................... 18

Chimney Safety Instit. of Am. v. Chimney King,
2004 WL 1465699 (N.D. Cal. May 27, 2004) ....................................... 6

Citibank, N.A. v. Citytrust,
756 F.2d 273 (2d Cir. 1985) ................................................................. 6

Citigroup Inc. v. City Holding Co.,
2003 WL 282202 n.8 (S.D.N.Y. Feb. 10, 2003) ............................. 15, 17

Cohn v. Petsmart, Inc.,
281 F.3d 837 (9th Cir. 2002) ......................................................... 22, 23

Colony Food, Inc. v. Sagemark, Ltd.,
735 F.2d 1336 (Fed. Cir. 1984) .................................................... 16, 17

CTF Dev., Inc. v. Penta Hospitality, LLC,
2009 WL 3517617 (N.D. Cal. Oct. 26, 2009) ....................................... 7

eBay Inc. v. MercExchange, L.L.C.,
547 U.S. 388 (2006) ............................................................................ 24

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Kendall Brill
& Klieger LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

Entrepreneur Media, Inc. v. Smith,
279 F.3d 1135 (9th Cir. 2002)...................................................................... 19, 20, 21

Everest Capital Ltd. v. Everest Funds Management, LLC,
393 F.3d. 755 (8th Cir. 2005) .......................................................................... 18

Fuddruckers, Inc. v. Doc's B.R. Others, Inc.,
826 F.2d 837 (9th Cir. 1987)........................................................................... 16

Glow Indus., Inc. v. Lopez.,
252 F. Supp. 2d 962 (C.D. Cal 2002) ............................................................. 24

Halo Management, LLC v. Interland, Inc.,
308 F. Supp. 2d 1019 (N.D. Cal. 2003) ......................................................... 14

Herbalife Int'l, Inc. v. Lumene N. Am. LLC,
2007 WL 4225776 (C.D. Cal. Oct. 15, 2007) ............................................... 23

HGI Mktg. Services, Inc. v. Pepsico Inc.,
50 F.3d 14 (9th Cir. 1995)............................................................................... 18

High Tech Med. Instrumentation, Inc. v. New Image Indus., Inc.,
49 F.3d 1551 (Fed. Cir. 1995) ........................................................................ 25

Instant Media, Inc. v. Microsoft Corp.,
2007 WL 2318948 (N.D. Cal. Aug. 13, 2007) .............................................. 19

International Jensen, Inc. v. Metrosound U.S.A., Inc.,
4 F.3d 819 (9th Cir. 1993)........................................................................ passim

J & J Snack Foods Corp. v. ,
McDonalds Corp., 932 F.2d 1460 (Fed. Cir. 1991) ...................................... 17

le Cordon Bleu, S.A. v. BPC Publ'g Ltd.,
451 F. Supp. 63 n.14 (S.D.N.Y. 1978)................................................... passim

M2 Software v. Madacy,
Entm't, 421 F.3d 1073 (9th Cir. 2005) .......................................................... 24

Matrix Motor Co., Inc. v. Toyota Jidosha Kabushiki Kaisha,
290 F. Supp. 2d 1083 (C.D. Cal. 2003)............................................... 19, 21, 23

Maxim Integrated Products, Inc. v. Quintana,
654 F. Supp. 2d 1024 (N.D. Cal. 2009) ......................................................... 24

National Steel Car, Ltd.  v. Canadian P. Ry., Ltd.,
357 F.3d 1319 (Fed. Cir. 2004)......................................................................... 5

Oakland Tribune, Inc. v. Chronicle Publ'g Co., Inc.,
762 F.2d 1374 (9th Cir. 1985)........................................................................... 6

Palm Bay Imps., Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772,
396 F.3d 1369 (Fed. Cir. 2005) ...................................................................... 21

Kendall Brill
& Klieger LLP

10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

_Playmakers, LLC v. ESPN, Inc.,_
297 F. Supp. 2d 1277 (W.D. Wash. 2003) .................................................................. 18, 22

_PostX Corp. v. docSpace Co., Inc.,_
80 F. Supp. 2d 1056 (N.D. Cal. 1999) ............................................................................ 20

_Premier Nutrition, Inc. v. Organic Food Bar, Inc.,_
475 F. Supp. 2d 995 (C.D. Cal. 2007)................................................................. 6, 16, 24

_Primepoint, LLC v. Primepay, Inc.,_
545 F. Supp. 2d 426 (D.N.J. 2008) ................................................................................ 17

_Protech Diamond Tools, Inc. v. Liao,_
2009 WL 1626587 (N.D. Cal. Jun. 8, 2009) .................................................................... 6

_Robi v. Five Platters, Inc.,_
918 F.2d 1439 (9th Cir. 1990) .......................................................................................... 7

_Self-Ins. Inst. of Am., Inc. v. Software & Info. Indus. Ass'n,_
208 F. Supp. 2d 1058 (C.D. Cal. 2000) .......................................................................... 16

_SRI Int'l v. Acoustic Imaging Techs. Corp.,_
1993 WL 356896........................................................................................................... 25

_Tie Tech, Inc. v. Kinedyne Corp.,_
296 F.3d 778 (9th Cir. 2002)............................................................................................ 6

_Torres v. Cantine Torresella S.r.l.,_
808 F.2d 46 (Fed. Cir. 1986) ............................................................................................ 7

_Two Pesos, Inc. v. Taco Cabana, Inc.,_
505 U.S. 763, 112 S. Ct. 2753, 120 L. Ed. 2d 615 (1992) ............................................ 19

_United Drug Co. v. Theodore Rectanus Co.,_
248 U.S. 90 (1918) ......................................................................................................... 14

_Volkswagen AG v. Verdier Microbus & Camper, Inc.,_
2009 WL 928130 (N.D. Cal. Apr. 3, 2009) ................................................................... 25

_Winter v. NRDC, Inc.,_
555 U.S. __, 129 S. Ct. 365 (2008) ............................................................................ 6, 24


**Statutes**

15 U.S.C. § 1064 .............................................................................................................. 7

15 U.S.C. § 1115 .............................................................................................................. 6

15 U.S.C. § 1127(1) ....................................................................................................... 15

**Kendall Brill
& Klieger LLP**
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

56826.1

v

10-CV-2614-WHA

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

I. **INTRODUCTION**

In July 2007, Electronic Arts Inc. ("EA") announced that its development studio, EA Digital Illusions CE AB ("EA DICE"), was developing a revolutionary new video game entitled *Mirror's Edge*. The game is set in a city of gleaming, reflective skyscrapers and empty streets whose population has been marginalized by a totalitarian regime. Players are placed in the shoes of a character named Faith, a "runner" who transmits messages for insurgents while evading government surveillance. The network of rooftops and aerial skyways that Faith and other runners utilize to avoid the prying eyes of the police is dubbed the "Mirror's Edge." The game was featured as a cover story in the August 2007 issue of a leading video game magazine, and *Mirror's Edge* quickly became one of the most anticipated video game releases of 2008.

In September 2008, more than a year after *Mirror's Edge* had been announced and on the eve of its long-planned release, one-time video game designer Tim Langdell wrote to EA on behalf of his wholly-owned companies, Edge Games, Inc. ("Edge Games") and The Edge Interactive Media, Inc. ("Edge Interactive"), claiming that EA's use of the phrase "Mirror's Edge" infringed his rights in a purported "family" of "Edge"-based trademarks. Nearly 20 years had passed since Langdell or his companies had last developed a video game, and they had never published any game using "edge" in its title. Nonetheless, Langdell claimed that *Mirror's Edge* would create confusion with his registered marks, including EDGE for various paper goods, CUTTING EDGE for comic books, and GAMER'S EDGE for computer and video game related hardware and software.[1] EA explained that there was no likelihood of confusion between *Mirror's Edge* and Langdell's purported marks— or, for that matter, any of the hundreds of other registered and common law trademarks containing the word "edge" for the same types of goods, including dozens in the titles of video games alone. Langdell nonetheless persisted in his claims of infringement and repeatedly threatened in October through December 2008 to commence litigation and file for provisional relief.

---

[1] The only trademark registration that Langdell ever held for EDGE in connection with video game programs (Reg. No. 1,853,705) was cancelled by the United States Patent and Trademark Office ("PTO") on June 18, 2005 and is listed as "DEAD" in PTO records. *See* Request for Judicial Notice ("RJN") Ex. A.

Kendall Brill
& Klieger LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

56826.1                                    1                        10-CV-2614-WHA
DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

1    Langdell did not carry through on his threats at that time, or for more than 18 months

2  thereafter.  In the interim, EA released *Mirror's Edge* for the Sony PlayStation 3 and Microsoft

3  Xbox 360 consoles (November 2008), Windows-based PCs (January 2009), and Apple iPad (April

4  2010).  EA sold more than two million units of the console and PC versions of the game and tens of

5  thousands of iPad downloads, and the game won numerous awards.  On June 15, 2010, Langdell

6  reappeared via his complaint in this action and the press release simultaneously issued by his

7  counsel, repeating the very same claims of infringement that he had threatened two years earlier.

8  Another two months passed before Langdell filed the present motion for a preliminary injunction.

9    Langdell's claims have no merit.  His purported trademarks are not valid, having been

10  obtained through fraud and without any bona fide use in commerce.  To the extent any of the

11  registrations were valid when issued, they have long since been abandoned.  Langdell's credibility

12  has been thoroughly shredded in various PTO and federal court proceedings, with Langdell and his

13  companies having repeatedly been found to have made knowingly false statements and to have

14  submitted documents that appeared to have been doctored, forged, or altogether fabricated.  He has

15  resorted to the same tactics with respect to the registrations at issue here, including in connection

16  with the present motion.  Moreover, as the absence of even a single instance of actual confusion over

17  the last three years should suggest, EA's use of "Mirror's Edge" poses no likelihood of confusion

18  even if Langdell's registrations are ultimately found to be valid.  Finally, Langdell offers no excuse

19  for his extraordinary delay in filing suit and moving for a preliminary injunction, and identifies no

20  harm, let alone irreparable harm, that he or his companies will suffer absent provisional relief.  In

21  short, Langdell cannot make any of the showings required before an injunction may issue, and the

22  motion should be denied.

23  **II.    FACTUAL BACKGROUND**

24        **A.    EA's *Mirror's Edge* Video Game**

25    EA announced its development of *Mirror's Edge* in July 2007 and heavily promoted the

26  game through its fall 2008 release, including at such high-profile video game and popular culture

27  events as the Electronic Entertainment Expo (E3) and Comic-Con.  Hershberger Decl. ¶¶ 4, 9-10.

28  EA released the game for the Sony PlayStation 3 and Microsoft Xbox 360 consoles in November

Kendall Brill
& Klieger LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

56826.1                                    2                        10-CV-2614-WHA
DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

1   2008, and for Windows-based PCs in January 2009. *Id.* ¶ 13. The product packaging and

2   advertisements for the game featured the following distinctive mark (the "MIRROR'S EDGE

3   mark"):

4

5   *Id.* ¶ 13 & Exs. D-E. EA's famous house mark and the distinctive EA DICE logo also appeared

6   prominently on the packaging and advertisements:

7

8   *Id.*

9          On September 8, 2009, EA DICE filed applications to register the MIRROR'S EDGE mark

10  for computer and video game software, comic books, and online video games. Schatz Decl. ¶ 20 &

11  Exs. P-R. Edge Games filed a letter of protest, alleging a likelihood of confusion with its purported

12  "family" of EDGE marks. RJN Ex. B.[2] The PTO examining attorney considered the evidence and

13  made an independent determination that the MIRROR'S EDGE mark did not create any likelihood

14  of confusion with any of Edge Games' marks, and the registrations issued on June 22, 2010. Schatz

15  Decl. ¶ 21 & Ex. S. Edge Games filed notices of opposition to registration of the marks, which the

16  PTO rejected as untimely on August 20, 2010. RJN Ex. C.[3]

17         On December 2, 2009, EA announced that it was developing a version of *Mirror's Edge* for

18  the Apple iPhone and iPod Touch. Correa Decl. ¶ 2. Following Apple's unveiling of its iPad tablet

19  device in January 2010, EA accelerated development of an iPad version of *Mirror's Edge* so as to be

20

21         [2] A letter of protest "is an informal procedure created by and existing at the discretion of
    the PTO, whereby third parties may bring to the attention of the PTO evidence bearing on the
22  registrability of a mark." Trademark Manual of Examination Procedures ("TMEP") § 1715. The
    granting of a letter of protest does not require the examining attorney to issue a refusal, but to
23  make an "independent determination" whether to refuse registration. *Id.* § 1715.02.

24         [3] EA had earlier filed an application to register the word mark MIRROR'S EDGE. Schatz
    Decl. ¶ 16 & Ex. L. After the PTO issued a preliminary refusal of the application and suspended
25  the proceedings pending the outcome of other pending matters, EA discovered that the application
    had been erroneously submitted in the name of EA rather than EA DICE, which owns the mark.
26  *Id.* ¶ 16. EA therefore voluntarily abandoned the application. *Id.* ¶ 19. As discussed in footnote
    11, *infra*, that preliminary decision of the PTO is not competent evidence of a likelihood of
27  confusion and is owed no deference in these proceedings.

28

Kendall Brill
& Klieger LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

56826.1                                            3                                    10-CV-2614-WHA
DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

1  one of the inaugural releases for the device.  *Id.* ¶ 5.  The iPad version of the game went on sale

2  through Apple's App Store on April 2, 2010.  *Id.*  An iPhone version launched on September 1, 2010

3  and, like the iPad version, is available exclusively from Apple's App Store.  *Id.* ¶ 4.

4  Through June 2010, EA has sold more than two million units of the console and PC versions

5  of *Mirror's Edge* worldwide, including more than 750,000 units in North America.  Hershberger

6  Decl. ¶ 17.  Through August 2010, there have been more than 37,000 downloads of the iPad version

7  of the game from Apple's App Store.  Correa Decl. ¶ 6.  Except for downloads of the PC version of

8  the game from EA's own website, EA is no longer manufacturing or distributing the console or PC

9  versions of the game.  Hershberger Decl. ¶ 18.  Any ongoing sales of those versions of the game by

10 third-party retailers are from those retailers' own stock previously purchased from EA, and EA has

11 no authority to require those retailers to stop selling their existing inventory of *Mirror's Edge.*  *Id.*

12  **B.      Plaintiff's Delay In Filing Suit And Moving For Provisional Relief**

13 Edge Games is one of several companies wholly owned and operated by Langdell.  Landgell

14 Decl. ¶¶ 2-3.  Langdell formed Softek: Masters of the Game, a video game publishing company, in

15 the United Kingdom in 1979.  *Id.* ¶ 2.  Through 1989, Softek released a number of video games for

16 such now-obsolete video game systems as the Amiga, Amstrad CPC, Atari ST, Commodore 64,

17 Oric, and Sinclair ZX Spectrum.  *Id.* ¶ 2; Klieger Decl., Ex. A.  In 1990, Langdell relocated to Los

18 Angeles and incorporated Edge Interactive.  Langdell Decl. ¶ 3.  The California Franchise Tax Board

19 suspended Edge Interactive in April 2004 for non-payment of taxes.  RJN Ex. D.  Langdell thereafter

20 incorporated Edge Games in July 2005.  Langdell Decl. ¶ 3.  In February 2008, prior to its corporate

21 existence being revived, Edge Interactive purported to assign its rights in various registered

22 trademarks and pending applications to Edge Games.  RJN Ex. D.[4]

---

[4] Langdell operates his companies as alter egos of one another and of himself.  Indeed, Langdell confirms in his declaration that he is the sole owner of Softek, Edge Interactive, and Edge Games and repeatedly refers to the companies as "my business" and to their products and services as "my products and services." Langdell Decl. ¶ 4.  For convenience, EA therefore refers to Langdell and his various companies collectively herein as "Langdell" except where the context requires otherwise.

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Kendall Brill
& Klieger LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

1    Langdell concedes that he learned of EA's then-forthcoming release of *Mirror's Edge* by no

2  later than July 12, 2007.  Langdell Decl. ¶ 25.  However, more than a year passed before Langdell

3  first wrote to EA, on September 24, 2008, to claim infringement.  Schatz Decl. ¶ 2 & Ex. A.[5]  EA

4  responded with a seven-page letter detailing the absence of any likelihood of confusion, and further

5  requesting information and documents related to Langdell's and his licensees' use of his purported

6  marks.  *Id.* ¶ 4 & Ex. B.  EA corresponded with Langdell through December 2008, with Langdell

7  refusing to provide any information and repeatedly threatening to file for an injunction.  *Id.* ¶ 4-12 &

8  Exs. C-J.  Langdell did not file suit, however, but instead fell silent until June 2009, when he

9  initiated a short round of settlement talks with EA.  *Id.* ¶ 13.  Those talks terminated without

10  resolution in July 2009.  *Id.*  Langdell next wrote to EA nearly a year later, on March 2, 2010, to

11  threaten claims in connection with EA's then-forthcoming iPhone and iPod Touch versions of

12  *Mirror's Edge*.  *Id.* ¶ 14 & Ex. K.  EA did not respond, and Langdell again fell silent.  *Id.* ¶ 15.

13    Langdell did not file suit until June 15, 2010, nearly three years after he first became aware

14  of EA's alleged infringement, more than 18 months after *Mirror's Edge* went on sale, and after more

15  than two million units of the game had been sold.  Langdell's counsel issued a press release that

16  same day announcing the filing of this lawsuit.  Klieger Decl., Ex. B.  Langdell waited another two

17  months, until August 20, 2010, before filing its present motion.

18  ## III.   ARGUMENT

19    "A preliminary injunction is a drastic and extraordinary remedy that is not to be routinely

20  granted."  *National Steel Car, Ltd.  v. Canadian P. Ry., Ltd.*, 357 F.3d 1319, 1324 (Fed. Cir. 2004).

21  "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits,

22  that he is likely to suffer irreparable harm in the absence of preliminary relief, and that an injunction

23

24    [5] Contrary to Langdell's assertions, EA did not receive any correspondence from Langdell
in July 2007, nor did it receive any communications from him at any time prior to September 24,
25  2008.  Schatz Decl. ¶ 3.  As discussed in note 9, *infra*, the Trademark Trial and Appeal Board
("TTAB") has repeatedly found Langdell to have made false statements regarding whether and
26  when he had sent or received various documents, and has further suspected him of falsifying
documents (including not only his own letters, but also Express Mail receipts and a purported
27  letter from the Postmaster of the Pasadena, California Post Office).

28

Kendall Brill
& Klieger LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

1  is in the public interest." *Winter v. NRDC, Inc.*, 555 U.S. __, 129 S. Ct. 365, 374 (2008).  Lengthy

2  delay before seeking an injunction "implies a lack of urgency and irreparable harm." *Oakland*

3  *Tribune, Inc. v. Chronicle Publ'g Co., Inc.,* 762 F.2d 1374, 1377 (9th Cir. 1985).  Indeed, in a

4  trademark action, "undue delay, standing alone, constitutes grounds for rejecting a motion for

5  preliminary injunction." *Protech Diamond Tools, Inc. v. Liao*, 2009 WL 1626587, at *6 (N.D. Cal.

6  Jun. 8, 2009); *See Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985) ("Significant delay in

7  applying for injunctive relief in a trademark case … alone may justify denial of a preliminary

8  injunction.").

9      **A.**    **Plaintiff Cannot Demonstrate A Likelihood Of Success On The Merits**

10        To prevail on his claims of trademark infringement, Langdell must show that he owns valid

11  and protectable marks that are in use in commerce and that EA has used terms or designs similar to

12  those marks in a manner that is likely to cause confusion. *See Chimney Safety Instit. of Am. v.*

13  *Chimney King*, 2004 WL 1465699, at *2 (N.D. Cal. May 27, 2004).  Langdell bears the burden of

14  proof on each of these elements. *See Premier Nutrition, Inc. v. Organic Food Bar, Inc.*, 475 F.

15  Supp. 2d 995, 1000 (C.D. Cal. 2007).  He cannot satisfy that burden.

16      **1.**    **Plaintiff's Purported Marks Are Not Valid**

17        The validity of Langdell's purported marks "is a threshold issue upon which all subsequent

18  analysis … depends." *Premier Nutrition*, 475 F. Supp. 2d at 1007.  "A necessary concomitant to

19  proving infringement is, of course, having a valid trademark; there can be no infringement of an

20  invalid mark." *Tie Tech, Inc. v. Kinedyne Corp.*, 296 F.3d 778, 783 (9th Cir. 2002).  While

21  registration constitutes prima facie evidence of validity, the presumption of validity may be rebutted

22  on various grounds, including that the registration was obtained fraudulently or that the mark has

23  been abandoned by the registrant. *Id.*; 15 U.S.C. § 1115.  A preliminary injunction is properly

24  denied where, as here, "there is great doubt as to the validity of the trademark." *International*

25  *Jensen, Inc. v. Metrosound U.S.A., Inc.*, 4 F.3d 819, 822 (9th Cir. 1993); *see Advertise.com, Inc. v.*

26  *AOL Advertising, Inc.*, __ F.3d __, 2010 WL 3001980, at *7 (9th Cir. 2010) (vacating preliminary

27  injunction where defendant could likely rebut presumption of validity of registered mark).

28

**Kendall Brill**
**& Klieger LLP**
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

(a)     **Plaintiff Obtained, Maintained, And/Or Renewed At Least Five Of The Registrations Through Fraud**

A registered trademark is invalid and may be cancelled upon a showing that the registrant made a false representation of material fact with the intent and effect of inducing reliance by the PTO. 15 U.S.C. § 1064; *see Robi v. Five Platters, Inc.,* 918 F.2d 1439, 1444 (9th Cir. 1990). This may include false representations in connection with either the application to register a trademark or the maintenance or renewal of a registration. *See Robi*, 918 F.2d at 1444; *Torres v. Cantine Torresella S.r.l.*, 808 F.2d 46, 48 (Fed. Cir. 1986). An inference of fraudulent intent is easily drawn in the case of affirmative false statements, as opposed to possibly inadvertent omissions. *CTF Dev., Inc. v. Penta Hospitality, LLC*, 2009 WL 3517617, at *6 (N.D. Cal. Oct. 26, 2009); *see also le Cordon Bleu, S.A. v. BPC Publ'g Ltd.*, 451 F. Supp. 63, 72 n.14 (S.D.N.Y. 1978) (alteration of specimen is an "obvious subterfuge" constituting fraud). Here, there is compelling evidence that Langdell obtained, maintained, and/or renewed at least five of his registrations through fraud.

(i)     **THE EDGE (Reg. No. 3,559,342)**

On March 22, 1996, Langdell applied to register the mark THE EDGE for various goods, including video game software and comic books. RJN Ex. E. Langdell submitted as evidence of supposed use of the mark a box cover of a game entitled "Snoopy: The Cool Computer Game." *Id.* That game had been released in 1989, seven years earlier, was no longer being sold, and thus did not reflect the mark as used in commerce at the time the application was filed. Klieger Decl., Ex. C. Moreover, the box cover was not a genuine specimen at all, but had instead been doctored by Langdell to support his claim of trademark rights:

**Submitted Specimen**     **Genuine Article**

  

Kendall Brill
& Klieger LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

56826.1                                  7                              10-CV-2614-WHA
DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

1  *Id.*  Specifically, Edge Interactive added a trademark symbol (™) and legend reading "The Edge is a

2  trademark of The Edge Interactive Media," neither of which was part of the actual box cover.

3  Indeed, it appears that Langdell simply taped the false legend on top of the copyright notice that was

4  part of the genuine article:

  

5

6

7      On November 28, 2005, Langdell submitted an additional specimen purporting to reflect

8  THE EDGE as it was used in connection with comic books.  RJN Ex. F.  The comic book pictured in

9  the specimen had been published by an unrelated company more than a decade earlier, in April 1995.

10  Bard Decl. ¶ 11.  Again, Langdell doctored the specimen in an effort to create trademark rights:

11          **Submitted Specimen**          **Genuine Article**

          

12

13

14

15

16

17

18

19  Klieger Decl., Ex. D.  Specifically, Langdell changed the title from "EDGE" to "THE EDGE,"

20  added a trademark symbol (™) following the title, and taped on a new legend reading "'The Edge' is

21  the trademark of The Edge Interactive Media, Inc.  All Rights Reserved."

22

23  

24  None of these were part of the actual comic book cover—a copy of which, remarkably, is posted on

25  Langdell's own website.  *Id.*, Ex. E.  The PTO registered the mark on January 13, 2009, in reliance

26  on Langdell's false representations.  RJN Ex. G.

27

28

Kendall Brill
& Klieger LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

56826.1                                    8                        10-CV-2614-WHA
DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

1

**(ii)    GAMER'S EDGE (Reg. No. 3,381,826)**

2       On February 5, 2006, Langdell applied to register the mark GAMER'S EDGE for various

3   goods, including video game software.  RJN Ex. H.  Langdell submitted the box cover of a video

4   game entitled "Garfield: Winter's Tail" as evidence of his supposed use of GAMER'S EDGE.  *Id.*

5   Softek had released that title 15 years earlier, in 1989, and the specimen did not reflect the mark as

6   used in commerce at the time of the application.  Klieger Decl., Ex. F.  In fact, the GAMER'S

7   EDGE mark had not been used in connection with that game at all, and instead Langdell had

8   doctored the specimen to add the supposed mark at the bottom corner of the box:

9               **Submitted Specimen**          **Genuine Article**

10
11
12
13                  
14
15
16
17  *Id.*  Tellingly, when Langdell had earlier petitioned to cancel a third-party registration of GAMER'S

18  EDGE in 1993, he did not claim ever to have used the mark, despite the fact that the above game had

19  been published just four years earlier.  RJN Ex. I.  The PTO registered the GAMER'S EDGE mark

20  on February 12, 2008, in reliance on Langdell's false representations.  *Id.* Ex. J.

21              **(iii)    EDGE (Reg. No. 2,219,837)**

22      In January 1999, the PTO issued a registration of the EDGE mark to Langdell for use in

23  connection with various paper goods, including magazines related to video games.  RJN Ex. K.  On

24  August 18, 2004, Langdell filed a Combined Declaration of Use and Incontestability under Sections

25  8 & 15, in which he certified that his companies (1) had made continuous use of the EDGE mark in

26  commerce for at least five consecutive years following the January 1999 registration date; and (2)

27  were continuing to use the mark in commerce as reflected in a specimen described as "a(n) Color

28  scan of the front cover of our EDGE Games Magazine, July 2004 edition, with the registration serial

Kendall Brill
& Klieger LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

56826.1                                9                          10-CV-2614-WHA
DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

number written clearly on it." *Id.* Ex. L.  Future, which publishes Edge Magazine, has confirmed that the specimen submitted by Langdell does not depict the actual cover of that or any other issue of the magazine:

**Submitted Specimen**          **Genuine Article**



Binns Decl. ¶ 13 & Ex. C.  The PTO accepted the Combined Declaration and maintained the registration in reliance on Langdell's false representations.  RJN Ex. M.

On February 10, 2009, Langdell filed a Combined Declaration of Use in Commerce and Application for Renewal of Registration of a Mark under Sections 8 & 9, in which he certified that his companies were continuing to use the EDGE mark in commerce in connection with the covered goods.  *Id.* Ex. N.  Langdell submitted a specimen described as "exterior packaging … for software PC game 'Mythora,'" supposedly on sale from Edge Interactive since 2004.  *Id.* Ex. O; Langdell Decl. ¶ 16.  That specimen, and the claimed sales of "Mythora" during the relevant statutory period, are highly suspect.[6]  The PTO renewed the registration in reliance on Langdell's false representations of use during the statutory period.  RJN Ex. R.

**(iv)     EDGE (Reg. No. 3,105,816)**

On January 29, 2003, Langdell filed a second application to register EDGE for various paper goods, including comic books.  RJN Ex. S.  Langdell submitted as evidence of supposed use in

---

[6] In particular, the specimen directs consumers to www.mythora.com, a web domain that was not even registered until October 2008, four years after the game's supposed release.  RJN Ex. P.  Moreover, there is no evidence that Langdell offered "Mythora" for sale any time before September 1, 2009—which, not coincidentally, is the same date on which Langdell filed an application to register MYTHORA as a trademark.  *Id.* Ex. Q.

Kendall Brill
& Klieger LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

56826.1                                    10                          10-CV-2614-WHA
DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

1   commerce a "[s]canned cover of our comic book EDGE issue 2," which he certified reflected the

2   mark as it was then being used in commerce. *Id.* In fact, the comic book reflected in the specimen

3   had been published more than a decade earlier, in August 1994, by an unrelated company and had

4   been long out of print. Bard Decl. ¶ 11. The PTO registered the mark on June 20, 2006, in reliance

5   on Langdell's false representations. RJN Ex. T.

6                      **(v)**        **CUTTING EDGE (Reg. No. 2,251,584)**

7         On or about April 17, 1995, Marvel filed an application to register the mark CUTTING

8   EDGE, which it intended to use as the title of a comic book published as part of its Marvel Edge line

9   of comic books. Bard Decl. ¶ 3. Marvel published a single issue of *Cutting Edge* in December

10   1995. *Id.* ¶ 6. The title has been out of print for nearly 15 years, and Marvel has not published any

11   other title using the CUTTING EDGE name or mark. *Id.* In November 1996, a year after the only

12   issue of *Cutting Edge* had been published, Langdell filed a Notice of Opposition to Marvel's

13   registration of CUTTING EDGE. RJN Ex. U. Langdell claimed that his companies had made

14   "extensive use" of that same mark since October 1984. *Id.*[7] Marvel assigned its rights in the mark,

15   including the then-pending application, to Langdell in or about September 1997, and the registration

16   issued on June 8, 1999. RJN Ex. V.

17         On November 26, 2005, Langdell filed a Combined Declaration of Use and Incontestability

18   under Sections 8 & 15 in which he certified that the CUTTING EDGE mark had been in continuous

19   use in commerce for at least five consecutive years after the June 1999 registration date and attached

20   the cover of a "currently on sale comic book sold via our licensee bearing our mark." *Id.* Ex. W. In

21   fact, the comic book was that published by Marvel in December 1995 and long since out of print.

22   Bard Decl. ¶ 11. The PTO accepted the 2005 Combined Declaration in reliance on Langdell's false

23

---

24         [7] In opposing various third-party applications to register marks containing the word "edge," Langdell has repeatedly claimed to have made "extensive use" of the same marks for the

25   same goods (*e.g.*, DOUBLE EDGE for comic books; EDGE3D for computer hardware; IMEDGE for image processing software; EDGE PRODUCTIONS for computer hardware; MAGIC EDGE

26   for real estate support services; MAGIC EDGE for theme park and amusement park rides; OVER THE EDGE for comic books; SOUND EDGE for sound boards; SOUL EDGE for interactive

27   entertainment programs; THE CUTTING EDGE for magazines; THE EDGE for key fobs, watches, and puzzles). RJN Exs. X-GG. These claims have never been substantiated.

28

Kendall Brill
& Klieger LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

56826.1                      11                     10-CV-2614-WHA
DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

1   representations.  RJN Ex. HH.  Langdell submitted the same comic book cover again on October 27,

2   2009, in connection with his Combined Declaration of Use and Application for Renewal of

3   Registration under Section 8 & 9, and certified that it reflected the mark as it was then being used in

4   commerce.  *Id.* Ex. II.  The PTO issued a renewal of the registration on November 16, 2009, in

5   reliance on Langdell's false representations.  *Id.* Ex. JJ.

**(b)      At Least Three Of The Registrations Are Void *Ab Initio***

7        At least three of the above registrations—EDGE (Reg. No. 3,105,816), THE EDGE (Reg.

8   No. 3,559,342), and GAMER'S EDGE (3,381,826)—are invalid for another reason as well.  Each of

9   the applications to register these marks was a use-based application, meaning that the application

10  was based on purported *actual use of the mark in commerce as of the date of the application*, as

11  opposed to a future intent to use the mark.  Because there was, in fact, no bona fide use of any of the

12  marks in commerce at the time of the applications, the resulting registrations are void *ab initio*.

13  *Aycock Engn'g, Inc. v. Airflite, Inc.*, 560 F.3d 1350, 1357 (Fed. Cir. 2009).

**(i)      THE EDGE (Reg. No. 3,559,342)**

15       The only specimens that Langdell submitted to the PTO as evidence that the EDGE mark

16  was being used in commerce in connection with video game software or comic books were (1) a box

17  cover for "Snoopy: The Cool Computer Game"; and (2) the cover of a comic book purportedly titled

18  "THE EDGE."  RJN Exs. E, F.  Neither evidences any bona fide use of THE EDGE mark in

19  commerce at the time of the March 1996 application.  "Snoopy: The Cool Computer Game" had

20  been released in 1989 for the by then defunct Amiga video game system.  Klieger Decl., Ex. C.  The

21  comic book had been doctored so as to change the title from "EDGE" to "THE EDGE," and did not,

22  in fact, reflect use of THE EDGE in commerce at any time, let alone at the time of the application.

23  *See* page 8, *supra.*  Langdell has not identified any other purported use of THE EDGE in commerce

24  at any time between 1990 and 1996.

**(ii)      GAMER'S EDGE (Reg. No. 3,381,826)**

26       The only specimen that Langdell submitted to the PTO as evidence that the GAMER'S

27  EDGE mark was being used in commerce at the time of the February 2006 application was a box

28  cover for the "Garfield: Winter's Tail" video game.  RJN Ex. H.  That game had been released 15

Kendall Brill
& Klieger LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

56826.1                                           12                            10-CV-2614-WHA
DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

1   years earlier for the Commodore 64 computer, which was long defunct by 2006, and did not reflect a

2   bona fide use in commerce at the time of the application.  Klieger Decl., Ex. F.  Moreover, because

3   Langdell had doctored the specimen, and the actual box cover had no GAMER'S EDGE markings at

4   all, it is not evidence of a bona fide use in commerce of the mark *at any time.  See* page 9, *supra.*

5          The other purported uses of GAMER'S EDGE at the time of the 2006 application relate to

6   supposed sales of mobile phone versions of three of Softek's 1980s titles ("Bobby Bearing,"

7   "Pengu," and "Battle Pods"), a purported 2003 reissue of a game entitled "Raffles," and the

8   purported 2004 release of "Mythora."  These supposed sales—all of which, with the exception of

9   "Raffles,"[8] are supposedly continuing through the present—are highly suspect.  For instance,

10  Exhibits K, N, O, and R to Langdell's declaration purport to be "true and correct exemplars" of

11  games purportedly available for purchase at www.smartcart.com.  Yet, every attempt to access those

12  pages through the filing of this motion—both by following links at www.edgegames.com and by

13  typing in the web page addresses directly—returned a message that "[t]he resource requested …

14  cannot be found."  Klieger Decl., Exs. G-R.  To the extent the exhibits are genuine at all, they must

15  therefore reflect pages that were accessible only to Langdell and not to consumers.  Indeed, the only

16  evidence that Langdell has sold *any* products over the past two decades is Langdell's own say-so.[9]

17  _____

18      [8] Langdell states that "Raffles" was sold from 2003 to 2008 but does not identify how
    many units were sold, where they were sold, or any details at all regarding the supposed sales.
19  The game is not offered for sale on archived versions of the Edge Games website
    (www.edgegames.com) that Langdell has submitted in connection with court proceedings.  RJN
20  Ex. KK.  And, to the extent Exhibit L is genuine, it appears to relate only to a UK release of the
    game.  *See* Langdell Decl., Ex. T (providing as contact information "www.edgegames.co.uk" and
21  an address of "PO Box 153, Kidlington, Oxon, OX5 1DU").

22      [9] This is not the first proceeding in which Langdell's credibility has been called into
    question.  In *The Edge Interactive Media, Inc. v. Edge Technology Pty. Ltd.*, Case No. 91103117,
23  the TTAB found that Langdell's submissions were "internally inconsistent and lack credibility,"
    that his claims that certain documents were filed "lack even a scintilla of credibility," and that a
24  letter Langdell submitted supposedly from the Postmaster of the Pasadena, California Post Office
    may have been forged.  RJN Exs. LL-NN.  In *The Edge Interactive Media, Inc. v. Edge Systems,
25  Inc.*, Case No. 91107325, the TTAB found Langdell's "unsupported claims as to the filing and
    service of various papers lacking in credibility" and further commented on Langdell's "lack of
26  candor in dealing with … the Board."  RJN Ex. OO.  In *Collector's Edge of Tennessee, Inc. v. The
    Edge Interactive Media, Inc.*, Case No. 91107996, the TTAB found Edge Interactive's credibility,
27  based solely on Langdell's submissions, to be "severely lacking."  *Id.* Ex. PP at 10 (citing other

28

Kendall Brill
& Klieger LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

56826.1                                              13                              10-CV-2614-WHA
                      DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

1

                       **(iii)**      **EDGE (Reg. No. 3,105,816)**

2         The only specimen that Langdell submitted to the PTO as evidence that the EDGE mark was

3 being used in commerce at the time of the January 2003 application was the cover of a comic book

4 that had been published by an unrelated company more than a decade earlier and did not reflect the

5 mark as used by Langdell at any time, let alone at the time of the application.  RJN Ex. S.  The only

6 other evidence that Langdell has identified of supposed use of this mark in commerce as of January

7 2003 is (1) Edge Magazine, published by Future as a purported licensee; and (2) the CUTTING

8 EDGE, OVER THE EDGE, and DOUBLE EDGE comic book series, published by Marvel as a

9 purported licensee.  Langdell Decl. ¶¶ 21-23.  Although Future was a licensee of Edge Interactive

10 between 1996 and 2004, that license covered only use of the EDGE mark in relation to print and

11 online versions of Edge Magazine *in the UK* and therefore did nothing to establish a bona fide use in

12 U.S. commerce.  Binns Decl. ¶ 10.  Marvel was not a licensee at all, and each of the comic books

13 identified by Langdell had been out of print for at least six years by the time of the application.  Bard

14 Decl. ¶ 9-11.

15                       **(c)**      **Each Of Plaintiff's Purported Marks Has Been Abandoned**

16         To the extent Langdell ever had rights in any of the asserted marks, those rights have been

17 lost through abandonment.  It is a bedrock principle that rights in a trademark "grow out of its use,

18 not its mere adoption."  *Halo Management, LLC v. Interland, Inc.*, 308 F. Supp. 2d 1019, 1032 (N.D.

19 Cal. 2003) (quoting *United Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90, 97 (1918)).  A mark is

20

21 matters in which Langdell's "explanations of lost mail" were found "lacking"); Ex. QQ at 2
("given [Langdell's] dubious credibility on this subject, it seems questionable that [the motions]

22 were mailed"); RR at 3-6 (discussing Langdell's apparent falsifying of an Express Mail label).

23         More recently, the United States District Court for the Eastern District of Virginia found
that Edge Interactive had made "clearly false" statements as part of a "deliberate effort to mislead

24 the Court.."  *Id.* Ex. D ("[a] concerted effort to mislead the Court and gain an unfair advantage in
litigation"; "flagrant disregard of the rules of court and concerted effort to mock procedural

25 safeguards"; "strategy to obfuscate and mislead the Court"; "conscious strategy to mislead the
Court").  The findings were based on the sworn statements of "Jack Phillips"—a self-described

26 "Vice President" of Edge Interactive who made false representations regarding Langdell's
supposed departure from the company.  *Id.* Exs. SS, TT.  It remains unclear who "Jack Phillips" is

27 and what relationship he has to Langdell and his companies.

28

**Kendall Brill
& Klieger LLP**
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

56826.1                            14                 10-CV-2614-WHA

1   deemed "abandoned" when it has been discontinued with intent not to resume such use.  15 U.S.C. §

2   1127(1).  Non-use of a mark for three consecutive years constitutes prima facie evidence of

3   abandonment.  "[T]oken or sporadic use is insufficient to overcome a showing of abandonment."

4   *Citigroup Inc. v. City Holding Co.*, 2003 WL 282202, at *17 n.8 (S.D.N.Y. Feb. 10, 2003).

5        Langdell has not shown that his companies made *any* use of the asserted marks from 1989 to

6   at least 2003.  Rather, his purported evidence of use during this 14-year period is based exclusively

7   on activities of purported licensees.  Langdell Decl. ¶¶ 21-23.  However, the facts are not as

8   presented:

9    - Langdell asserts that Marvel has used CUTTING EDGE and EDGE in connection
10     with the CUTTING EDGE, OVER THE EDGE, and DOUBLE EDGE comic book
       series from 1995 to the present.  *Id.* ¶ 23.  Indeed, Langdell specifically declares
11     that these comic books are "currently marketed by Edge's duly authorized
       licensee[] [Marvel]."  *Id.* ¶ 22.  In reality, Marvel is not (and never has been) a
12     licensee of Langdell or his companies, and the above comic books have out of print
       for nearly 15 years.  Bard Decl. ¶¶ 6, 10.
13
14   - Langdell asserts that EdgeGamers Organization LLC ("EdgeGamers") has used
       EDGEGAMERS in connection with a video gaming community web site from 2000
15     to the present.  Langdell Decl. ¶ 22.  The trademark application, however, identifies
       a first use date of July 2006, or six years later than Langdell suggests.  RJN Ex. UU.
16
     - Langdell asserts that Malibu Comics/Steven Grant have licensed EDGE in
17     connection with an EDGE comic book series that has been published from 1995 to
       the present.  Langdell Decl. ¶ 23.  In fact, the final installment of that three-issue
18     series was published in early 1995, after Marvel's acquired Malibu Comics, and
       Marvel has no plans to publish additional books in the series.  Bard Decl. ¶ 11.
19
20   - Langdell asserts that Velocity Micro has used EDGE and GAMER'S EDGE in
       connection with personal computers from 1998 to the present.  Langdell Decl. ¶ 23.
21     While this may be true, there was no relationship between Langdell and Velocity
       Micro for the vast majority of this period. RJN Ex. D.  Indeed, Langdell sued
22     Velocity Micro for alleged infringement of his GAMER'S EDGE mark in 2008.  *Id.*
       Thus, whatever relationship may now exist between Langdell and Velocity Micro
23     does nothing to protect against abandonment prior to 2008.
24
     - Langdell does not identify any use of the THE EDGE by any purported licensee
25     between 1989 and 2003 (or, indeed, at any time prior to 2009), such that THE
       EDGE mark has presumptively been abandoned as well.
26
27        In addition to abandonment through non-use, Langdell also has abandoned any rights he

28   might otherwise claim in the EDGE mark through naked licensing.  Langdell's declaration discloses

Kendall Brill
& Klieger LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

56826.1
15
10-CV-2614-WHA
DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

1    that Future has been licensed to use the EDGE mark in connection with the online edition of Edge

2    Magazine.  *Id.* ¶ 23.  What his declaration does not disclose is that the license does not afford

3    Langdell or his companies *any* right to exercise quality control with respect to the goods or services

4    in connection with which the mark is used.  Binns Decl. ¶ 16.  That so-called "naked" license

5    constitutes abandonment of the mark and estops Langdell from asserting any rights therein.  *See*

6    *Barcamerica Int'l USA Trust v. Tyfield Importers, Inc.*, 289 F.3d 589, 596 (9th Cir. 2002); *McCarthy*

7    *on Trademarks* § 17:6, at 17-9 (4th ed. 2003).[10]

8                      **2.    Plaintiff Cannot Demonstrate A Likelihood Of Confusion**

9           Even if Landgell could "demonstrate a likelihood of success in establishing that [he] owns a

10   protectable mark, [he] still must prove that there is a high likelihood that customers will be

11   confused."  *Premier Nutrition*, 475 F. Supp. 2d at 1004.  "Likelihood of confusion exists when

12   customers viewing the mark would probably assume that the product or service it represents is

13   associated with the source of a different product or service identified by a similar mark."

14   *Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*, 826 F.2d 837, 845 (9th Cir. 1987).  Confusion must be

15   "probable, not simply a possibility."  *Self-Ins. Inst. of Am., Inc. v. Software & Info. Indus. Ass'n*, 208

16   F. Supp. 2d 1058, 1070 (C.D. Cal. 2000).  "Thus, the law requires a showing that the allegedly

17   infringing conduct carries with it a likelihood of confounding an appreciable number of reasonably

18   prudent purchasers exercising ordinary care."  *Id.*

19                      **(a)    Plaintiff Does Not Own A "Family" Of Marks**

20          Likelihood of confusion is a "fact-intensive inquiry" that must be undertaken with respect to

21   each mark that a plaintiff contends has been infringed.  *See Au-Tomotive Gold, Inc. v. Volkswagen of*

22   *Am., Inc.*, 457 F.3d 1062, 1076 (9th Cir. 2006).  Where a plaintiff claims infringement of more than

23   one mark, likelihood of confusion must be separately analyzed with respect to each mark.  *See AM*

24   *Gen. Corp. v. DaimlerChrysler Corp.*, 311 F.3d 796, 821-22 (7th Cir. 2002); *Colony Food, Inc. v.*

---

25          [10] The fact that Langdell is unable to obtain information directly from his purported

26   licensees, and must instead rely upon internet reports regarding their activities, suggests that he
     has no quality control with respect to *any* of the purported licensees.  *See, e.g.,* Langdell Decl. ¶ 21

27   (licensee "reportedly sold over 91,000 units" according to "sales history as obtained from
     www.vgchartz.com"); *id.* ¶ 23 ("[r]eports indicate planned game launch in October 2010").

28

Kendall Brill
& Klieger LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

1  *Sagemark, Ltd.*, 735 F.2d 1336, 1339 (Fed. Cir. 1984).  The only exception is where plaintiff holds

2  rights in a "family" of marks, in which case confusion is analyzed in connection with the common

3  element of the family rather than each individual mark.  *See DaimlerChrysler*, 311 F.3d at 821-22.

4      Here, Langdell simply assumes, without any analysis, that his registrations give rise to a

5  family of "EDGE marks," and he then proceeds to analyze the likelihood of confusion with respect

6  to that supposed family rather than each asserted mark individually.  That assumption, however, is

7  fundamentally flawed.  A "family of marks" is defined as "a group of marks having a recognizable

8  common characteristic, wherein the marks are comprised and used in such a way that the public

9  associates not only the individual marks, but the common characteristics of the family, with the

10  trademark owner."  *J & J Snack Foods Corp. v. McDonalds Corp.*, 932 F.2d 1460, 1462 (Fed. Cir.

11  1991).  "Merely adopting and using—and even registering—a group of marks with a common

12  feature does not create a family of marks, even if the user intended to create a family."

13  *DaimlerChrysler*, 311 F.3d at 816.  Rather, "a family of marks exists only if and when the

14  purchasing public recognizes that the common characteristic is indicative of a common origin of the

15  goods."  *Id.* at 814; *see City Holding*, 2003 WL 282202, at *20 (registration of nine marks with

16  common surname of "CITY" did not form family of marks absent evidence "that consumers

17  recognize that the nine marks are somehow related").

18      "Whether a family of marks exists is an issue of fact based on the common formative

19  component's distinctiveness, the family's use, advertising, promotion, and inclusion in party's other

20  marks."  *DaimlerChrysler*, 311 F.3d at 815.  The existence of a family of marks must be proven with

21  evidence, not supposition.  *Primepoint, LLC v. Primepay, Inc.*, 545 F. Supp. 2d 426, 434 (D.N.J.

22  2008); *see, e.g.*, *Colony Food*, 735 F.2d at 1339 (plaintiff did not establish a family of "HOBO"

23  marks in connection with restaurant services, notwithstanding its ownership of numerous registered

24  and common law marks combining HOBO with another word, where "there [was] no discernible

25  similarity or pattern in the words combined with HOBO in [plaintiff's] marks" and plaintiff had

26  "failed to establish, for example by a survey, that the term HOBO is used by the public in

27  connection with restaurant services identify [plaintiff] exclusively").  Moreover, public recognition

28  of a family of marks must be demonstrated as of the date infringement is alleged to have begun, and

Kendall Brill
& Klieger LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

56826.1                                    17                        10-CV-2614-WHA
DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

1    not such later date as the plaintiff may initiate litigation or seek provisional relief.  *DaimlerChrysler*,

2    311 F.3d at 819.

3          Landgell has presented no evidence whatsoever to establish the existence of a family of

4    EDGE marks at any time, let alone as of July 2007 when EA's alleged infringement began.

5    Langdell has not presented any evidence that he made any advertising expenditures to promote the

6    purported family of EDGE marks, that the marks were marketed as a group, or that consumers

7    actually recognize video games or comic books containing "edge" to emanate from Langdell or his

8    companies exclusively.  Likelihood of confusion must therefore be analyzed as to each asserted

9    mark, and not a non-existent "family" of marks.

10                    **(b)      The *Sleekcraft* Factors Heavily Favor EA**

11         Before registering MIRROR'S EDGE, the trademark examiner evaluated whether the mark

12   was confusingly similar to any registered mark or pending application.  As discussed above, the

13   examiner specifically considered the letter of protest filed by Langdell, found *no likelihood of*

14   *confusion*, and cleared the mark for registration.  *See* page 3, *supra*.[11]  Consideration of the

15   *Sleekcraft* factors leads to the same conclusion here.

16                         **(i)      Plaintiff's Marks Are Weak**

17         "The strength of the plaintiff's mark in a trademark infringement case will often determine

18   the breadth of the mark's protection—the stronger the mark, the greater the protection it is afforded."

19   *Playmakers, LLC v. ESPN, Inc.*, 297 F. Supp. 2d 1277, 1281 (W.D. Wash. 2003).  Marks are

20   _____

21         [11] Langdell argues that the PTO's prior refusal to register the word mark MIRROR'S
     EDGE demonstrates a likelihood of confusion.  That claim is both factually and legally
22   incorrect.  First, the examiner's February 2008 rejection of EA's first application was not
     designated as final and was thus nothing more than "a low-level preliminary determination [that]
23   was conclusory, not searching or analytical."  *A& H Sportswear, Inc. v. Victoria's Secret Stores,*
     *Inc.*, 237 F.3d 198, 221 (3d Cir. 2000); *see* TMEP § 714.01 (final action must include "a clear and
24   unequivocal statement that the refusal … is final").  Such determinations are considered
     inconclusive and unpersuasive because the PTO lacks the courts' access to evidence of actual
25   marketplace conditions, and are thus given little weight in litigation.  *See HGI Mktg. Services, Inc.*
     *v. Pepsico Inc.*, 50 F.3d 14 (9th Cir. 1995); *Carter-Wallace, Inc. v. Procter & Gamble Co.*, 434
26   F.2d 794, 802 (9th Cir. 1970); *see also Everest Capital Ltd. v. Everest Funds Management, LLC,*
     393 F.3d. 755, 764 (8th Cir. 2005) (affirming exclusion of evidence regarding trademark
27   examiner's initial determination of likelihood of confusion).

28

Kendall Brill
& Klieger LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

56826.1                                              18                            10-CV-2614-WHA
               DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

1   classified in one of four groups: (1) generic; (2) descriptive; (3) suggestive; and (4) arbitrary or

2   fanciful. *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768, 112 S. Ct. 2753, 120 L. Ed. 2d

3   615 (1992). Descriptive marks "describe the quality or features of the product." *Brookfield*

4   *Comms., Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1058 n.19 (9th Cir. 1999). "A suggestive

5   mark conveys an impression of a good but requires the exercise of some imagination and perception

6   to reach a conclusion as to the product's nature." *Id.* "Arbitrary and fanciful marks have no intrinsic

7   connection to the product with which the mark is used." *Id.* Generic, descriptive, and suggestive

8   marks are presumed to be weak; only arbitrary or fanciful marks are considered strong. *Id.* at 1058.

9       None of the asserted marks is arbitrary or fanciful. In the computer and video game context,

10  "edge"-based marks convey the idea of being at the forefront of technology and at the leading or

11  cutting edge of developments (*e.g.*, EDGE, THE EDGE, CUTTING EDGE, and EDGEGAMERS).

12  GAMER'S EDGE is equally descriptive as it conveys the idea that a consumer will have an "edge"

13  over other gamers. Finally, EDGE OF EXTINCTION describes the plot of an intended online game,

14  in which humanity is be struggling to rebuild after a futuristic apocalypse. At a minimum, each of

15  the marks has some intrinsic connection to the product with which it is used and is thus suggestive at

16  best. Whether descriptive or suggestive, each mark is conceptually weak. *Id.* 174 F.3d at 1058.

17  This alone is fatal to the plaintiff's claims. *Instant Media, Inc. v. Microsoft Corp.*, 2007 WL

18  2318948, at *12 (N.D. Cal. Aug. 13, 2007) ("Absent a conceptually strong senior mark, the reverse

19  confusion plaintiff will be unable to establish a likelihood of confusion, even if the junior user's

20  commercial strength is likely to overwhelm the plaintiff in the marketplace.").

21      The strength of Plaintiff's marks is further weakened by "extensive third party use of similar

22  marks on similar goods." *Matrix Motor Co., Inc. v. Toyota Jidosha Kabushiki Kaisha*, 290 F. Supp.

23  2d 1083, 1091 (C.D. Cal. 2003). The fact "that the marketplace is replete with products using a

24  particular trademarked word indicates … the likelihood that consumers will *not* be confused by its

25  use. The fact that the term ... resides in the public domain lessens the possibility that a purchaser

26  would be confused and think the mark came from a particular single source." *Entrepreneur Media,*

27  *Inc. v. Smith,* 279 F.3d 1135, 1144 (9th Cir. 2002) (internal quotation marks and citation omitted).

28  As Langdell himself has observed, "[t]here are many EDGE marks on the U.S. trade marks register

**Kendall Brill**
**& Klieger LLP**
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

56826.1                                    19                        10-CV-2614-WHA
DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

that have many different words combined with the word EDGE, and all of which have been granted

registration." RJN Ex. YY.[12]  A number of these marks are used in connection with video games or

comic books, including EB EDGE, EDGE ARCADE, EDGE-CORE, EDGE OF REALITY, and

DRAGON EDGE PINBALL for computer and video game software; EDGE for magazines and other

publications relating to computers, computer software, computer games, video games, hand-held

games, and other interactive media[13]; and CREATIVE EDGE, EDGE-MAN, SINGLE EDGE

STUDIOS, and TALES FROM THE EDGE in connection with comic books and comic strips.  *Id.*

In addition, there dozens of prominent common law marks using "edge" in connection with

video games and comic books.  Video game titles include *Edges*, *Knife Edge*, *Hard Edge*, *Circuit's*

*Edge*, *Karaoke Edge*, *Astronomica: The Quest for the Edge of the Universe*, *BAJA: Edge of Control*,

*Comanche: Over the Edge*, *Samurai Shodown: Edge of Destiny*, *Hired Guns: The Jagged Edge*,

*Independence War 2: Edge of Chaos*, *MX vs. ATV: On The Edge*, *MotorStorm: Arctic Edge*, *Twisted*

*Edge Snowboarding*, and *Meta-Galactic Llamas Battle at the Edge of Time*.  *Id.*, Ex. S.  Games

currently available for the iPhone include *Castrol EDGE Extreme Player*, *Cisco Edge Quest 2*,

*Mobigame's Edge*, *Vertex vs. Edge*, and *Wooly the Jumper: A Sheep on the Edge*.  *Id.*, Ex. T.  Online

games available to play on the internet include *Leading Edge*, *Double-Edge*, *On The Edge*, *Putting*

*Edge*, *Social Edge*, *Submachine 6: The Edge*, *Unnatural History: Edge of Danger*, and the online

gaming portal *Games on the Edge*.  *Id.*, Ex. U.  Other uses of EDGE in the video game space include

the well-known *Edge Card* loyalty program of GameStop, the world's largest video game retailer;

Adobe's *The Edge* newsletter for computer game and internet designers and developers; Gamer's

Edge Cyber Café locations and internet web site; *Gaming Edge*, a web site devoted to cheat codes

---

[12] PTO records reflect 2,875 live trademarks containing the word "edge," several hundred of which are in the same classes of goods claimed by Langdell and "are thus part of a field which at least broadly would include or be related to plaintiff's business."  *PostX Corp. v. docSpace Co., Inc.*, 80 F. Supp. 2d 1056, 1061 (N.D. Cal. 1999); *see* RJN Exs. VV-XX.

[13] Langdell assigned all rights in the EDGE mark in connection with such magazines and other publications to Future in 2004 and did not retain any rights in these areas.  Binns Decl. ¶¶ 7, 14-15.  The fact that a leading video game magazine, which bears no relation to Langdell, is named EDGE itself goes far toward dispelling Langdell's suggestion that any use of the word "edge" in connection with video games is associated exclusively with Langdell and his companies.

Kendall Brill
& Klieger LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

56826.1

20

10-CV-2614-WHA

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

and hints for videogame players; *Get The Edge*, a feature of popular internet portal Yahoo! that highlights tips and tricks for popular video games; as well as EDGE-Enhanced Doom Game Engine, an open-source software project based on the game *Doom. Id.,* Ex. V.  There are numerous common law uses of "edge" in connection with comic books as well, including *Edge of Doom*, the 10-volume series *Dark Edge*, *Nightwing: On The Razor's Edge*, and *World's Edge. Id.*, Ex. W.  This "crowded field" evidence establishes that the Langdell's purported marks are "exceedingly weak and diluted" and therefore "entitled to a very limited scope of protection."  *Matrix Motor Co.*, 290 F. Supp. 2d at 1091.

### (ii)    **Plaintiff's And EA's Marks Are Not Confusingly Similar**

Although MIRROR'S EDGE, Langdell's purported marks, and countless other registered and common law marks share the common word "edge," that shared term alone clearly does not make the marks *confusingly* similar.  In assessing the likelihood of confusion, marks must be compared "by looking at them as a whole, rather than breaking the marks up into the component parts for comparison."  4 McCarthy on Trademarks § 23.41.  "[W]hat is critical is the *overall* appearance of the marks as used in the marketplace, not a deconstructionist view of the different components of the marks."  *Playmakers*, 297 F. Supp. at 1283.

The dominant portion of the MIRROR'S EDGE mark is MIRROR'S.  Consumers are generally more inclined to focus on the first word, prefix, or symbol in any trademark or service mark.  *See Palm Bay Imps., Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772*, 396 F.3d 1369, 1372 (Fed. Cir. 2005).  Indeed, Langdell has acknowledged in PTO proceedings that in the case of a possessive followed by "edge," "it is the word EDGE that merely modifies the core mark."  RJN Ex. YY.  None of Langdell's purported marks includes the word MIRROR or anything similar in appearance, sound, or meaning.  Nor, with the exception of EDGE OF EXTINCTION, are any of those marks even contemplated (let alone used) as game titles.  Moreover, EA's distinctive design mark creates a unique commercial impression.  The mark is comprised of the words "Mirror's Edge" in stylized form accompanied by a jagged, irregular geometric shape with pointed edges, suggestive of a broken shard of a mirror, which is echoed in the distinctive design around the eye of the game's protagonist:

**Kendall Brill**
**& Klieger LLP**
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

56826.1

21

10-CV-2614-WHA

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION



Hershberger Decl. ¶ 13 & Ex. D.  The commercial impression in the marketplace is entirely different

from that created by the marketplace appearance of any of Langdell's purported marks[14]:



Langdell Decl., Exs. T, Y, Z; RJN Exs. E, H, W, Q, S.

      Finally, to the extent there is any possibility of confusion at all, that possibility is dispelled by

EA's inclusion of its famous house mark and EA DICE studio mark on the *Mirror's Edge* product

packaging and advertisements.  *See Cohn v. Petsmart, Inc.*, 281 F.3d 837, 842 (9th Cir. 2002).

**(iii)**    <u>**Plaintiff And EA Use Different Marketing Channels**</u>

      The next factor compares the channels through which the parties' goods or services are

marketed.  "Examples of marketing channels include the type of market (retail or wholesale), point

of sale, type of retail establishment, and methods of advertising."  *Playmakers*, 297 F. Supp. 2d at

1283.  Even where there is some overlap, the fact that the parties' marketing efforts are concentrated

in different media weighs against a likelihood of confusion.  *Cohn,* 281 F.3d at 842.  Landgell

purports to sell goods through his websites, "second-tier wholesalers," "independent retailers,"

"several online mobile phone game stores," and Amazon.com.  Langdell Decl. ¶ 16.[15]  Langdell does

not claim that he has done *any* advertising, let alone any significant advertising, in the marketplace.

      EA, by contrast, markets and sells its products through traditional consumer advertising

(including television, print, and in-store) and traditional retail channels (including mass

---

[14] Future is presently litigating a claim that Langdell copied the logos on the bottom row from the distinctive logo Future has used for Edge Magazine since 1993.  Binns Decl. ¶ 11.

[15] Edge Games is listed as "Just Launched" on the Amazon.com site, suggesting that it has only recently begun offering products through the site.  Klieger Decl., Ex. X.

**Kendall Brill
& Klieger LLP**
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

56826.1

22

10-CV-2614-WHA

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

1 merchandisers, electronics retailers, video game retailers, club stores, and online retailers).

2 Hershberger Decl. ¶¶ 11, 14. The iPad and iPhone versions of *Mirror's Edge* are sold exclusively

3 through Apple's App Store. Correa Decl. ¶¶ 4-5. The only possible overlap is in sales through

4 Amazon.com, which standing alone is insubstantial. *See Herbalife Int'l, Inc. v. Lumene N. Am. LLC*,

5 2007 WL 4225776, at *9 (C.D. Cal. Oct. 15, 2007) (noting that sites like Amazon.com and eBay

6 "provide a platform for individuals and companies of all types to sell their products," and therefore

7 even "if a website such as Amazon.com or Ebay.com did carry both [plaintiff's and defendant's

8 products], it would not be sufficient overlap, absent other convergent marketing channels, to allow

9 the Court to weigh this factor in favor of [plaintiff]").

10 **(iv)**     <u>**There Is No Evidence Of Actual Confusion**</u>

11       Langdell is unable to cite a single instance of actual confusion, despite the fact that *Mirror's*

12 *Edge* has been on sale for nearly two years and more than two million units of the game have been

13 sold. Although the absence of actual confusion is not dispositive, this "lack of evidence of actual

14 confusion after an ample opportunity for confusion can be a powerful indication that the junior

15 trademark does not cause a meaningful likelihood of confusion." *Cohn*, 281 F.3d at 843.

16 **(v)**     <u>**The Remaining Factors Also Favor EA**</u>

17       The remaining *Sleekcraft* factors also favor EA:

18       *Proximity of goods***.** While at first blush, Landgell's and EA's products appear similar, "the

19 mere fact that two products or services fall within the same general field … does not mean that the

20 two products or services are sufficiently similar to create a likelihood of confusion." *Matrix Motor*,

21 290 F. Supp. 2d at 1092. EA develops and publishes innovative games for the latest platforms, such

22 as the Sony PlayStation 3, Microsoft Xbox 360, and Apple iPad. Hershberger Decl. ¶ 2. To the

23 extent Langdell has any "market," it is very different. Langdell does not develop games for these or

24 any other contemporary platform, but instead appears to repackage his own rudimentary 1980s

25 releases for such long-obsolete video game systems as the Amiga and Commodore 64 so that they

26 can be played on entry-level PCs and cell phones.

27       *Degree of care***.** The *Mirror's Edge* console game is not an impulse buy. It retailed for

28 $59.99 at launch and requires that a consumer own or purchase an expensive video game system.

**Kendall Brill**
**& Klieger LLP**
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

56826.1

23

10-CV-2614-WHA

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Hershberger Decl. ¶ 14.  The iPad and iPhone versions of the game, which cost $9.99 and $4.99, respectively, are sold exclusively through Apple's App Store for play on its iPad and iPhone devices. Correa Decl. ¶¶ 4, 6.  Landgell does not sell any products at retail, where impulse buys might more commonly be expected, and even his supposed cell phone games are listed at $2.49 per download (and not $0.99 as declared by Langdell).  Klieger Decl. Ex. Y.

**Defendant's intent.**  To establish bad faith, Landgell must show that EA intended to deceive consumers.  *See Glow Indus., Inc. v. Lopez.,* 252 F. Supp. 2d 962, 1002-03 (C.D. Cal 2002).  Mere knowledge of Langdell or his marks does not suffice.  *Id.*  As in most cases in which reverse confusion is alleged, there is no evidence that EA named *Mirror's Edge* for the purpose of deceiving consumers.

**Likelihood of expansion.**  Although Landgell claims that he has been actively developing games for the Sony PlayStation 3, Microsoft Xbox 360, iPad, and iPhone these claims are wholly unsubstantiated and wholly unrealized.  At a minimum, Landgell has made not shown the "*strong possibility of expansion into competing markets*" that would be required for this factor to weigh in his favor.  *M2 Software v. Madacy Entm't*, 421 F.3d 1073, 1085 (9th Cir. 2005).

## B.  <u>Plaintiff Cannot Demonstrate Irreparable Harm</u>

Landgell attempts to invoke the presumption of irreparable harm that has traditionally attached in the trademark context following a showing of likely success on the merits.  However, this presumption is not available to Landgell for at least three reasons.  First, because Langdell cannot demonstrate a likelihood of success on the merits, no presumption can attach.  *Premier Nutrition*, 475 F. Supp. 2d at 1007.

*Second*, after the Supreme Court's rulings in *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006), and *Winter*, *supra,* a plaintiff seeking a preliminary injunction against trademark infringement "is no longer entitled to a presumption of irreparable harm on the ground that it has shown a likelihood of success on the merits."  *Maxim Integrated Products, Inc. v. Quintana*, 654 F. Supp. 2d 1024, 1030 (N.D. Cal. 2009).  "The standard under *Winter* requires that [the plaintiff] demonstrate, by the introduction of admissible evidence and with a clear likelihood of success that the [irreparable] harm is real, imminent and significant, not just speculative or potential."

Kendall Brill
& Klieger LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

56826.1
24
10-CV-2614-WHA
DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

1 | *Volkswagen AG v. Verdier Microbus & Camper, Inc.*, 2009 WL 928130, at *6 (N.D. Cal. Apr. 3,

2 | 2009).  Langdell's failure to make this particularized showing is fatal to its motion.

3 |      *Finally*, Langdell's more than three-year delay in seeking provisional relief negates any

4 | presumption of irreparable harm that might otherwise attach.  *See High Tech Med. Instrumentation,*

5 | *Inc. v. New Image Indus., Inc.*, 49 F.3d 1551, 1557 (Fed. Cir. 1995) (denying injunction in light of

6 | 17 months of delay); *Advanced Rotorcraft Tech. v. L-3 Comms. Corp.*, 2007 WL 437682, at *8

7 | (denying injunction where dispute had begun more than two years earlier); *SRI Int'l v. Acoustic*

8 | *Imaging Techs. Corp.*, 1993 WL 356896, at *4 (delay of less than a year can preclude relief).

9 |      **C.**     <u>**The Balance Of Hardships Favors EA**</u>

10 |      Unlike Langdell, who has not demonstrated any hardship, EA will suffer significant hardship

11 | if an injunction issues.  EA continues to actively market and sell the iPad and iPhone versions of

12 | *Mirror's Edge*, which required a team of 36 individuals nearly 18 months to complete, and it

13 | projects an additional half a million dollars in sales of those versions through the end of 2010 alone.

14 | Correa Decl. ¶¶ 3, 8.  These sales are driven by the goodwill EA has built in the title over the past

15 | several years, and there is no realistic way to sustain this goodwill or transfer it to a new title if an

16 | injunction issues.  *Id.* ¶ 8-10.

17 |      **D.**     <u>**The Public Interest Will Be Harmed If An Injunction Issues**</u>

18 |      Finally, Landgell cannot show that a preliminary injunction is in the public interest.  Indeed,

19 | given that there is no likelihood of confusion, an injunction would accomplish nothing more than to

20 | "deprive consumers of a choice of products." *Aurora World, Inc. v. Ty Inc.*, 2009 WL 6617192, at

21 | *39 (C.D. Cal. Dec. 15, 2009) (citing *International Jensen*, 4 F.3d at 827).

22 | **IV.**     <u>**CONCLUSION**</u>

23 |      For the foregoing reasons, the Court should deny the motion.

24 | Dated:  September 9, 2010     KENDALL BRILL & KLIEGER LLP

25 |

26 |

27 |      By:  /s/ Robert N. Klieger
           Robert N. Klieger
           Attorneys for Defendant and Counterclaimants

28 |

**Kendall Brill
& Klieger LLP**
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

56826.1                 25               10-CV-2614-WHA
DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION