United States District Court
For the Northern District of California

1
2
3
4
5
6
7          IN THE UNITED STATES DISTRICT COURT

8          FOR THE NORTHERN DISTRICT OF CALIFORNIA

9
10
11   EDGE GAMES, INC., a California                    No. C 10-02614 WHA
     corporation,
12
                    Plaintiff,
13                                                     **ORDER DENYING MOTION FOR**
        v.                                             **PRELIMINARY INJUNCTION**
14
     ELECTRONIC ARTS, INC., a Delaware
15   corporation,

16                  Defendant.
                                                  /
17

18                           **INTRODUCTION**

19          In this trademark infringement action involving video-gaming giant Electronic Arts, Inc.

20   and its "revolutionary" first-person, action-adventure video game "Mirror's Edge," plaintiff Edge

21   Games, Inc. — a so-called "small video-gaming company" based in Pasadena — moves to

22   preliminarily enjoin defendant Electronic Arts from using the "MIRROR'S EDGE" mark while

23   this dispute unfolds in court.  Because plaintiff has failed to establish that it is likely to succeed on

24   the merits, that it is likely to suffer irreparable harm in the absence of preliminary relief, that the

25   balance of equities tips in its favor, or that an injunction is in the public interest, the motion for a

26   preliminary injunction is **DENIED**.

27
28

**STATEMENT**

1. **PLAINTIFF EDGE GAMES, INC.**

Edge Games, Inc. is "one of the oldest surviving video game development and publishing businesses" on the planet — at least, that's what its founder, chief executive officer, and sole shareholder, Dr. Tim Langdell, would have a jury believe (Langdell Decl. ¶¶ 1–3). According to Dr. Langdell's declaration, he began using the "EDGE" mark in connection with video-game marketing and sales back in 1984 through a London-based video-game company called Softek (*id.* at ¶ 2). Softek is supposedly a predecessor-in-interest to Edge Games. After Dr. Langdell moved to Los Angeles in 1990, he reincorporated Softek as Edge Interactive Media (another supposed predecessor-in-interest to Edge Games). He then incorporated Edge Games — the alleged trademark holder herein — in 2005 (*id.* at ¶ 3).

Plaintiff Edge Games and its predecessors supposedly developed, distributed, and sold several dozen video games from the mid-1990s through 2010 bearing the asserted marks (*id.* at ¶ 17). Examples of recent video-game products purportedly marketed by Edge Games and bearing one or more of the asserted marks include "Bobby Bearing," "Raffles," "Mythora," "Pengu," "Battlepods," and "Racers" (*id.* at ¶ 14, Exhs. K–T). Between 2003 and 2009, Edge Games purportedly sold over 11,000 units of Raffles, Mythora, and Racers, which are "packaged PC video game" products, as well as over 45,000 units of Bobby Bearing, Pengu, and BattlePods, which are games that can be played on certain mobile phones (*id.* at ¶¶ 15–16). In addition to PC and mobile-phone video games, Dr. Langdell also claims that Edge Games develops, publishes, and/or licenses games for major gaming consoles such as the Sony PlayStation 3, and that various releases are currently being developed for gaming consoles and platforms including Microsoft's Xbox 360, the Nintendo Wii, and the Apple iPhone and iPad (*id.* at ¶ 15).

According to Dr. Langdell, these "upcoming" releases from Edge Games will supposedly be sold through the same retailers that the accused products were (and are still being) sold, such as Amazon.com, Best Buy, and Target (*id.* at ¶ 20). In sum, based upon Dr. Langdell's declaration, Edge Games is a legitimate "small video-gaming company" that is active in the video-gaming industry.

2

United States District Court

For the Northern District of California

2.   **DEFENDANT ELECTRONIC ARTS, INC.**

Electronic Arts — or EA for short — is a leading "interactive entertainment" company that develops, publishes, and distributes video games and related software for modern gaming consoles including Microsoft's Xbox 360, the Sony PlayStation 3, and the Nintendo Wii, as well as for PCs, Macs, and various mobile-gaming devices. Since its formation in 1982, EA has grown to become an international, publicly traded corporation with more than ten video-game development studios spanning the globe. In 2009 alone, EA had sales exceeding one million units for at least 31 of its active video-game franchises (Hershberger Decl. ¶ 2).

"Mirror's Edge" is one of EA's modestly successful video-game franchises. Developed by EA Digital Illusions CE AB (or "EA DICE" for short) in Stockholm, Sweden — one of EA's ten video-game development studios — the "Mirror's Edge" franchise stands at the heart of the instant trademark dispute (*id.* at ¶ 3).

3.   **THE "MIRROR'S EDGE" FRANCHISE**

In July 2007, EA announced in "Edge Magazine" — a leading print and online video-game magazine published by Future Publishing — that its EA DICE development studio was creating a "revolutionary new take on the first-person action adventure game" entitled "Mirror's Edge" (*id.* at ¶ 4). The announcement was a cover story in the magazine, and it was accompanied by a press release issued by EA on July 11, 2007, officially announcing the development of the "Mirror's Edge" video game (*id.* at Exh. A; Binns Decl. ¶ 3, Exh. F). According to EA's senior marketing director, Lincoln Hershberger, "Mirror's Edge" was widely known and discussed throughout the gaming industry and became one of the most anticipated video-game releases of 2008 (Hershberger Decl. ¶ 5). Tens of millions of dollars were invested by EA in the game's development, which spanned three years and involved a team of over 60 individuals (*id.* at ¶ 8).

The game itself is set in a city of gleaming skyscrapers with reflective surfaces and empty streets, whose population has been marginalized by a totalitarian regime. Players interact with and explore this world through the eyes of a character named "Faith," who is a messenger (or, as the game describes her, a "runner") tasked with covertly delivering information, messages, and other items within the city while evading government surveillance. The network of rooftops and

3

aerial skyways that Faith and other "runners" utilize to make these deliveries and evade the government is dubbed the "Mirror's Edge" (*id.* at ¶ 6).

Prior to its official release, "Mirror's Edge" was demonstrated and publicized at numerous industry events, including the Game Developers Conference in February 2008 and the Electronic Entertainment Expo (or "E3") in July 2008. E3 is widely regarded as the most important expo in the video-game industry (*id.* at ¶ 9). Also in July 2008, "Mirror's Edge" was showcased at Comic-Con, the largest comic-book convention in the world, where a limited-run comic-book adaptation of "Mirror's Edge" was announced. The six-issue "Mirror's Edge" comic "mini-series" was published in 2008 and 2009 by a division of DC Comics (*id.* at ¶ 10). In total, EA invested over $9 million to market "Mirror's Edge" in North America (*id.* at ¶ 11).

In November 2008, "Mirror's Edge" was released for the Sony PlayStation 3 and Microsoft's Xbox 360. A PC version followed in January 2009 (*id.* at ¶ 13). These games were sold through retail channels including mass merchandisers (*e.g.*, Walmart, Target), electronics sellers (*e.g.*, Best Buy), video-game resellers (*e.g.*, GameStop), club stores (*e.g.*, Costco), and online retailers (*e.g.*, Amazon.com) (*id.* at ¶ 14). Since its initial release, over two million units of "Mirror's Edge" have been sold worldwide, including over 750,000 units in North America alone (*id.* at ¶ 17). While EA is no longer manufacturing or distributing copies of "Mirror's Edge" for the Sony PlayStation 3, the Microsoft's Xbox 360, or the PC for third-party retailers, the PC version of the game remains available for download on EA's online store (*id.* at ¶ 18).

Due to its modest success, additional products were developed for the "Mirror's Edge" franchise. In February 2009, EA released "additional downloadable context" for the game, which was sold as "Mirror's Edge Pure Time Trials Map Pack" (*id.* at ¶ 15). Additionally, a separate and "substantially scaled down" side-scrolling version of the game was announced in December 2009 and developed from scratch for the Apple iPad, iPhone, and iPod Touch (Correa Decl. ¶¶ 2–6). This side-scrolling version of the game — published in 2010 — was entitled "Mirror's Edge 2D." It is currently available for purchase through Apple's App Store, where over 37,000 units have already been downloaded for the Apple iPad (*id.* at ¶¶ 4–6; Hershberger Decl. ¶ 15).

4

1    Finally, a Mac version of the original "Mirror's Edge" video game is currently under

2    development and is slated for release later this year (Hershberger Decl. ¶ 13).

3            **4.      THE ASSERTED AND ACCUSED MARKS**

4            As should be obvious by this point, this trademark battle centers on EA's use of the word

5    "Edge" in the "Mirror's Edge" franchise.  The logo for "Mirror's Edge" and examples of how

6    "Mirror's Edge" appeared in advertising and product packaging are reproduced below (*id.* at ¶¶

7    11–13, Exhs. D–E; Shafer Decl. ¶ 2, Exhs. A–H):




21          As shown, the logos for both EA and EA DICE were prominently displayed on the game's

22   packaging and advertising.  In the reproductions above, the logos for EA and EA DICE are most

23   clearly seen on the bottom right of the Xbox 360 cover art.  The logos for EA and EA DICE were

24   also placed on the advertisement (to the left of "There's No Looking Back").  While difficult to

25   see in the reproduction above, the logos are clearly visible on the normal sized version.

26          The "MIRROR'S EDGE" mark is owned by EA DICE.  The application was filed in

27   September 2009 and — over a letter of protest filed by Edge Games — the United States Patent

28   and Trademark Office approved the registration of the "MIRROR'S EDGE" mark on June 22,

**United States District Court**
For the Northern District of California

5

United States District Court

For the Northern District of California

1  2010, for computer and video game software, comic books, and online video games (Schatz Decl.

2  ¶ 21, Exh. S).

3  Turning next to the asserted marks in this action, Edge Games is the purported owner of

4  six federally registered trademarks that it supposedly "uses and selectively licenses" to other

5  companies. These marks are: (1) "EDGE," (2) "THE EDGE," (3) "GAMER'S EDGE," (4)

6  "EDGE OF EXTINCTION," (5) "CUTTING EDGE," and (6) "EDGEGAMERS." Edge Games

7  also claims common-law trademark rights over the "EDGE" logo (Langdell Decl. at ¶¶ 4–12,

8  Exh. T). Each mark will be described briefly below.

9  **A.    "EDGE"**

10  Edge Games purportedly owns two valid USPTO registrations for the mark "EDGE" as

11  used in connection with printed matter and publications relating to video games and comic books.

12  According to Dr. Langdell, the "EDGE" mark was in continuous use since 1985, and — for at

13  least one of the two registrations — is incontestable. Edge Games also asserts ownership over the

14  common-law mark "EDGE" for use in connection with video-game software and related goods

15  and services, with continuous use supposedly extending back to 1984 (*id*. at ¶ 6, Exhs. A–C).

16  **B.    "THE EDGE"**

17  Plaintiff also supposedly owns a valid registration for the mark "THE EDGE," issued by

18  the USPTO in 2009 for use in connection with video-game software, video-game controllers, and

19  video-game magazines, with continuous use allegedly extending back to 1995 (*id.* at ¶ 7, Exh. D).

20  **C.    "GAMER'S EDGE"**

21  Another registered mark purportedly owned by Edge Games is "GAMER'S EDGE,"

22  issued by the USPTO in 2008 for use in connection with video-game software and various video-

23  game accessories, with continuous use supposedly extending back to 1986 (*id.* at ¶ 8, Exh. E).

24  Again, Dr. Langdell asserts that the plaintiff owns a valid registration over this mark.

25  **D.    "EDGE OF EXTINCTION"**

26  Ownership of the "EDGE OF EXTINCTION" mark is also claimed by Edge Games. This

27  mark was originally registered by a non-party and issued by the USPTO in 2003 for use in

28  connection with computer-game software, with continuous use purportedly extending back to

**United States District Court**
For the Northern District of California

2000. The mark was later assigned to Edge Games by the original registrant. According to Dr.

Langdell, the "EDGE OF EXTINCTION" mark is incontestable (*id.* at ¶ 9, Exh. F, G)

**E. "EDGEGAMERS"**

Edge Games also asserts ownership over the supposedly valid registered mark

"EDGEGAMERS," issued by the USPTO in 2008 for use in connection with an online computer-

gaming club, with continuous use extending back to 2006 (*id.* at ¶ 11, Exh. J).

**F. "CUTTING EDGE"**

The last registered mark purportedly owned by Edge Games — "CUTTING EDGE" — is

*not* related to video games. This mark was issued by the PTO in 1999 for use in connection with

comic books. The mark has supposedly been in continuous use extending back to 1995 and has

become incontestable (*id.* at ¶ 10, Exh. H, I).

**G. The "EDGE" Logo**

Finally, Edge Games claims ownership over a common-law mark, reproduced below, that

it asserts has been used continually as a trademark and service mark in connection with its video-

game software and related websites since 2001 (*id.* at ¶ 12):



**5. PLAINTIFF'S LICENSING PRACTICES**

According to Dr. Langdell's declaration, plaintiff's licensing practices have been prolific,

extending the reach of its asserted marks well beyond video-game software to gaming-related

print publications and websites, comic books, video-game hardware, and computers (*id.* at ¶ 21).

Licensed products supposedly include "Cross Edge," a video game for the Sony PlayStation 3

published by NIS America, and Edge Magazine, a leading video-gaming news magazine and

website published by Future Publishing, Inc. (*ibid.*; *id.* at Exhs. U, V). Additional products

purportedly licensed by Edge Games include (*id.* at ¶ 22):

- The "Edge" line of high-performance gaming computers
  sold by Velocity Micro, Inc. (*id.* at Exh. W).

United States District Court

For the Northern District of California

- The online computer game "Edge of Extinction" by Cybernet Systems Corp. (*id.* at Exh. Z).

- The website and video game "Edge of Twilight" by Fuzzyeyes Stupio Pty. Ltd. (*id.* at Exh. AA).

- The "Cutting Edge," "Over the Edge," and "Double Edge" comic-book series published by Marvel Comics, as well as the "Edge" comic-book series published by Malibu Comics (which is owned by Marvel) (*id.* at Exh. BB).

- The video-game controller for the Nintendo Wii called "The Edge," sold by Datel Design & Development Ltd. (*id.* at Exh. T).

- The "EdgeGamers" video-gaming website, operated by EdgeGamers Organization, LLC (*id.* at Exh. Y).

**6.    ALLEGATIONS OF FRAUD AND ABANDONMENT**

According to EA, almost nothing set forth above regarding Edge Games and its asserted marks can be trusted. Indeed, EA's opposition brief invests a substantial number of pages to a no-holds-barred attack on the validity of each of plaintiff's asserted marks and the credibility of Dr. Langdell's sworn representations made to both the USPTO and the Court. These attacks and supporting evidence — which raise serious questions regarding the veracity of Dr. Langdell's entire declaration — are set forth in detail below.

**A.    Fraud and Abandonment Regarding "EDGE"**

According to EA, the two registrations obtained by plaintiff for the "EDGE" mark were soaked in fraud. *First*, in January 1999, Edge Interactive Media (a predecessor to Edge Games) registered the "EDGE" mark for use in connection with various paper goods, including magazines related to video games (RJN Exh. K).[1] Five years later, in 2004, Edge Interactive Media filed a "Combined Declaration of Use and Incontestability under Sections 8 & 5," wherein Dr. Langdell certified to the USPTO that (1) his companies had made continuous use of the "EDGE" mark in commerce for at least five years following the January 1999 registration date, and (2) were continuing to use the mark in commerce as reflected in a specimen described as a "Color scan of the front cover of our EDGE Games magazine, July 2004 edition, with the registration serial

---

[1] Defendants' request for judicial notice of the records and documents cited herein is **GRANTED**.

United States District Court

For the Northern District of California

1  number written clearly on it" (*id*. at Exh. L).[2]  According to a declaration submitted by the

2  publisher of Edge Magazine, however, the magazine cover submitted to the USPTO by Dr.

3  Langdell was *not* a genuine copy of any magazine cover that had ever been published (Binns

4  Decl. ¶ 13, Exh. C).  *It was faked*.  The specimen submitted by Dr. Langdell to the USPTO (left)

5  and the actual Edge Magazine cover for July 2004 (right) are shown below:

 

**As Submitted to the USPTO**          **Actual Cover**

16  The USPTO apparently relied upon Dr. Langdell's declaration and false specimen and maintained

17  the "EDGE" registration (RJN Exh. M).

18   *Second*, in January 2003, Edge Interactive Media filed a separate application with the

19  USPTO for the "EDGE" mark in connection with various paper goods, including comic books

20  (RJN Exh. S).  As evidence of his company's "use" of the "EDGE" mark in commerce, Dr.

21  Langdell submitted to the USPTO a "[s]canned cover of our comic book EDGE issue 2."  The

22  comic-book cover submitted as a specimen, however, had been published by an entirely different

23  and unrelated company *more than a decade earlier* (Bard Decl. ¶ 11).  Even more remarkable,

24  according to the magazine's publisher, Marvel Entertainment, LLC, the last "Edge" comic book

25  ever published was in the spring of 1995 (*id*. at ¶¶ 9–11).  Nevertheless, the USPTO registered the

26  "EDGE" mark on June 20, 2006, in apparent reliance on Dr. Langdell's sworn representation that

27  _____

28    [2]  This order notes that all of the USPTO filings and declarations signed by Dr. Langdell contained a
clear warning that "willful false statements . . . are punishable by fine or imprisonment" and could jeopardize
the validity of the document.

United States District Court

For the Northern District of California

the comic book cover was representative of plaintiff's *current use* of the "EDGE" mark in commerce (RJN Exh. T).

In this connection, EA also presents compelling evidence that there was no bona fide use of the "EDGE" mark in commerce by plaintiff, its licensees, or its predecessors in interest *at all* between 1989 and to at least 2003.[3]  In presenting this evidence, EA asserts that Dr. Langdell's declaration filed in support of the instant motion contains numerous misrepresentations.  For example, in his declaration, Dr. Langdell asserts (Langdell Decl. ¶ 22) (emphasis added):

> 22.      Attached hereto as Exhibits W, X, Y, Z, AA, BB & CC are true and correct exemplars of product packaging and services *currently marketed by Edge's duly authorized licensees* that display one or more of the EDGE family of marks.  These include:
>
> *          *          *
>
> f.      Licensee Marvel Comics' "CUTTING EDGE," "Over the EDGE," and "Double EDGE" comic book series, and licensee Malibu Comics' "Edge" comic book series, as promoted at www.edgegames.com.  *See* Exhibit BB.

As stated, however, the last installment of the "Edge" comic-book series was published by Malibu Comics (owned by Marvel) in the spring of 1995 (Bard Decl. ¶ 11).  Similarly, the last publication of Marvel's "Cutting Edge" comic book was in December 1995, the last publication of Marvel's "Over the Edge" comic mini-series was in August 1996, and the last publication of Marvel's "Double Edge Alpha" and "Double Edge Omega" comics was in October 1995 (*id.* at ¶¶ 4–6).  In other words, none of these comic books is being "currently marketed" — all have been out of print for nearly 15 years.  Even more egregious, according to Marvel Vice President and Deputy General Counsel Walter Bard, neither Marvel nor Malibu Comics are or were ever licensees of Dr. Langdell's companies for any of these marks (*id.* at ¶¶ 7, 10).

Similar alleged untruths plague Dr. Langdell's representations with respect to Edge Magazine's status as a licensee.  Although the magazine's publisher — Future Publishing — confirmed that it was a licensee of Edge Interactive Media between 1996 and 2004, the publisher also confirmed that the license only covered the use of the "EDGE" mark in relation to print and

---

[3]  This evidence is presented by EA to support its claim that the asserted marks have been abandoned.

10

1  online versions of Edge Magazine *in the United Kingdom* (Binns Decl. ¶ 6). During that time

2  period, Edge Magazine was not even distributed within the United States (*ibid.*). Then, in

3  October 2004, Future Publishing and Edge Interactive Media entered into a new agreement

4  wherein Future Publishing was granted a worldwide license to the marketing and promotion of

5  electronic versions of Edge Magazine (*id.* at ¶¶ 7–8). Critically, neither of these licensing

6  agreements granted plaintiff the right to exercise quality control over the use of the "EDGE"

7  marks. They were "naked" licenses.

8      Even after 2003, the evidence that plaintiff had been making bona fide use of the "EDGE"

9  mark in commerce is suspect. For example, Dr. Langdell's declaration asserted that Edge Games

10 has been selling the video game Mythora (supposedly bearing the "EDGE" mark) since 2004.

11 Curiously, while the exterior packaging submitted by Dr. Langdell to the USPTO for the Mythora

12 video game included a website address "www.mythora.com," this website wasn't even registered

13 by Edge Games until October 2008 — nearly four years after the game's purported release (RJN

14 Exhs. O, P). The USPTO relied upon this questionable video-game packaging when it renewed

15 plaintiff's "EDGE" mark in 2009 (*id.* at Exh. R).

16     **B.    Fraud and Abandonment Regarding "THE EDGE"**

17     Compelling evidence of fraud on the USPTO has also been submitted by EA with respect

18 to plaintiff's "THE EDGE" mark. For example, in March 1996, in his application to register the

19 mark "THE EDGE" for use with various goods, including video-game software and comic books,

20 Dr. Langdell submitted as evidence of supposed use of the mark a box cover of a game entitled

21 "Snoopy: The Cool Computer Game" (*id.* at Exh. E). The game, however, was already seven

22 years old at the time of the application, rendering it doubtful that it was still being sold in 1996

23 (Klieger Decl. ¶ 4, Exh. C). Even more disturbing, it appears as though the specimen of the box

24 cover for the video game submitted by plaintiff to the USPTO was doctored. The specimen

25 submitted by Dr. Langdell (left) and the actual box cover for "Snoopy: The Cool Computer

26 Game" (right) are shown below:

27

28

**United States District Court**
For the Northern District of California

 

**As Submitted to the USPTO**          **Actual Box Cover**

As shown, the "box cover" specimen submitted to the USPTO by Dr. Langdell and the actual box cover of the video game differ in two key respects. *First*, a "TM" has been added next to the logo for "THE EDGE" in the specimen submitted to the USPTO. *Second*, instead of a copyright disclaimer for the "PEANUTS characters," which appears on the bottom right of the genuine box, the specimen submitted to the USPTO contained an entirely different disclaimer that stated "The Edge is a trademark of The Edge Interactive Media, Inc."

Even more evidence of fraud is seen in the comic-book specimen submitted to the USPTO by Dr. Langdell in November 2005 for his application to register "THE EDGE" in connection with comic books (RJN Exh. F). In support of the application, Dr. Langdell submitted the cover of the "Edge" comic book — which, as stated, was last published a decade earlier by an unrelated company who was *never* a licensee of plaintiff — as a specimen. The specimen submitted to the USPTO (left) and the *actual* comic book (right) are shown below (Klieger Decl. ¶ 5, Exhs. D, E):



**As Submitted to the USPTO**          **Actual Comic Book**

**United States District Court**

For the Northern District of California

1    Once again playing "spot the differences," the specimen submitted to the USPTO appears to have

2    been doctored in three material ways.  *First*, and most egregious, the name of the comic book was

3    changed from "Edge" to "The Edge" in the specimen.  This was done apparently to show that

4    "THE EDGE" mark was being used in commerce in connection with comic books.  *Second*, a

5    "TM" was added to the manipulated title (it is visible on the top right of the last "E" in "EDGE").

6    *Third*, a disclaimer was tacked on to the bottom of the specimen that stated "'The Edge' is the

7    trademark of The Edge Interactive Media, Inc. All Rights Reserved."  These "enhancements"

8    were not present in the original comic-book cover.  Nevertheless, the USPTO relied upon Dr.

9    Langdell's application when it issued the registration for "THE EDGE" in 2009 (RJN Exh. G).

10          In light of these misrepresentations, EA argues that there are serious doubts over whether

11   "THE EDGE" mark was actually being used on *any* products by Edge Games during the period

12   between 1989 and 2003.

13          **C.     Fraud and Abandonment Regarding "GAMER'S EDGE"**

14          Evidence of fraud infects plaintiff's registration for "GAMER'S EDGE" as well.  In

15   February 2006, Dr. Langdell submitted an application to the USPTO to register "GAMER'S

16   EDGE" for various goods, including video-game software (*id.* at Exh. H).  As a specimen of his

17   company's use of the mark in commerce, Dr. Langdell submitted the box cover of a video game

18   entitled "Garfield: Winter's Tail," which had been released by Softek (a predecessor-in-interest to

19   Edge Games) *over seventeen years earlier* in 1989.  The specimen submitted to the USPTO (left)

20   and what EA asserts as being the *actual* box cover for the video game (right) are shown below

21   (Klieger Decl. ¶ 7, Exh. F):

22

23

24        

25

26

27

28          **As Submitted to the USPTO**          **Actual Box Cover**

United States District Court

For the Northern District of California

1    One critical difference stands out:  the "GAMER'S EDGE" mark that is visible on the specimen

2    submitted to the USPTO is *not* present anywhere on the genuine box cover for the video game.

3    Based upon this apparently doctored specimen submitted by Dr. Langdell, the "GAMER'S

4    EDGE" mark was issued to plaintiff in February 2008 for use with video games (RJN Exh. J).

5            In addition to this evidence assaulting the validity of plaintiff's "GAMER'S EDGE"

6    registration, EA has also submitted evidence calling into question whether plaintiff made bona

7    fide use of the "GAMER'S EDGE" mark over the past two decades.  In particular, EA has

8    submitted evidence demonstrating that Dr. Langdell's claimed sales of video games supposedly

9    bearing the "GAMER'S EDGE" mark are highly suspect (Opp. 13).  For example, when counsel

10   for EA attempted to purchase various video games that Dr. Langdell represented in his

11   declaration as being *currently sold* by Edge Games, they only received error messages stating that

12   "[t]he resource requested . . . cannot be found" (Langdell Decl. Exhs. K, N, O, R; Klieger Decl.

13   Exhs. G–R).[4]  Additionally, it is unclear from Dr. Langdell's exhibits whether certain games were

14   being sold in the United States rather than the United Kingdom (Langdell Decl. Exh. T).  In any

15   event, given disturbing evidence that the "GAMER'S EDGE" mark may have been grafted

16   retroactively onto product packaging by plaintiff, the record is tainted as to whether the mark has

17   actually been used continuously by Edge Games or has been abandoned.

18           Finally, while Dr. Langdell claimed in his declaration that both "EDGE" and "GAMER'S

19   EDGE" were used in connection with the sale of personal computers since 1998, EA has

20   presented evidence that the vendor of these computers — Velocity Micro — did not even become

21   a licensee of plaintiff until 2008, when plaintiff sued Velocity Micro for trademark infringement

22   (*id.* at ¶ 23; RJN Exh. D).  In sum, there is no clear evidence — at least on this record — that

23   plaintiff or its licensees made any bona fide use of the "GAMER'S EDGE" mark prior to 2008.

24       **D.    Fraud and Abandonment Regarding "CUTTING EDGE"**

25           Fraud is also alleged by EA surrounding plaintiff's registration of the "CUTTING EDGE"

26   mark.  In April 1995, Marvel filed an application with the USPTO to register "CUTTING EDGE"

27   _____

28       [4]  While counsel for plaintiff attempted to explain these error messages at the hearing, the suspect
     legitimacy of plaintiff's current sales activities — including plaintiff's misleading representation that its
     products were sold on Amazon.com rather than Amazon.com Marketplace — cannot be ignored.

1   for use as the title of a comic book (Bard Decl. ¶ 3).  A single issue of "Cutting Edge" was then

2   published in December 1995.  No other "Cutting Edge" comic book has ever been published by

3   Marvel since that single issue (*id.* at ¶ 3).  In November 2006, Dr. Langdell filed a Notice of

4   Opposition to Marvel's registration of "CUTTING EDGE," claiming that his companies had

5   made "extensive use" of the mark since October 1984 (RJN Exh. U).  Marvel responded by

6   assigning its rights in the mark, including the pending application, to plaintiff in September 1997.

7   The registration issued in June 1999 (*id.* at Exh. V).

8       Fast-forward six years to November 2005.  Despite the fact that only *one* issue of the

9   "Cutting Edge" comic was ever published by Marvel in 1995, Dr. Langdell filed a "Combined

10  Declaration of Use and Incontestability under Sections 8 & 15" wherein he certified that the

11  "CUTTING EDGE" mark had been in *continuous use* in commerce for at least five years after the

12  June 1999 registration date.  To support this contention, he attached as a specimen what he

13  described as:  "Cover of *currently on sale* comic book sold via our licensee bearing the mark" (*id.*

14  at Exh. W) (emphasis added).  The specimen submitted to the USPTO, however, was the cover of

15  the same *single-issue* "Cutting Edge" comic published by Marvel in 1995.  In other words, the

16  specimen was most certainly *not* the cover of a comic book "currently on sale" in November

17  2005.  Additionally, the comic book was not, and had never been, "sold via [plaintiff's] licensee."

18  As stated, Marvel was never a licensee of any of Dr. Langdell's companies.

19      **7.    EVIDENCE OF DELAY IN FILING SUIT**

20      By his own admission, Dr. Langdell knew about the release of "Mirror's Edge" shortly

21  after it was announced in July 2007.  Indeed, he claims to have mailed a cease-and-desist letter to

22  EA (which was attached to his declaration) two days after "Mirror's Edge" was publicly

23  announced (Langdell Decl. ¶ 25, Exh. DD).  EA's legal department has no record of this July

24  2007 letter and Dr. Langdell did not receive a reply to it (*id.* at ¶ 25; Schatz Decl. ¶ 3).  According

25  to his declaration, Dr. Langdell then purportedly sent numerous letters to EA's legal department

26  in January, March, May, July, and September 2008, and left voice mails with the department in

27  February, April, June, and August of that year (Langdell Decl. ¶ 26).  Despite these assertions,

28  EA claims that it received *no* voice mails from Dr. Langdell during this time period and that the

15

United States District Court

For the Northern District of California

1    first letter it received from him was on September 24, 2008 (Schatz Decl. ¶ 3).[5]  In response to the

2    September 2008 letter, EA — through outside counsel — sent a letter in reply to Dr. Langdell

3    explaining EA why its "Mirror's Edge" video game did not infringe.   EA's reply letter also

4    requested additional documentation regarding the ownership and use of the asserted "EDGE"

5    marks (*id.* at ¶ 4, Exh. B).  A back-and-forth between EA's outside counsel, EA DICE, and Dr.

6    Langdell continued through December 2008, with Dr. Langdell threatening to seek a preliminary

7    injunction against EA in a letter dated November 10, 2008, and representing to EA that his

8    companies had recently prevailed in a similar trademark action against a third party "with

9    judgments in our favor" and "on the merits" (*id.* at ¶¶ 5–12, Exhs. C–J).[6]  Numerous purported

10   "final warnings" were given by Dr. Langdell to EA in these communications.  Meanwhile, sales

11   of "Mirror's Edge" began in earnest on November 11, 2008, with a PC version released shortly

12   thereafter on January 16, 2009 (Hershberger Decl. ¶ 13).

13          Instead of immediately seeking a preliminary injunction to halt these sales, Dr. Langdell

14   waited until June 2009 to re-attempt negotiations with EA (*id.* at ¶ 13; Langdell Decl. ¶ 28).  In

15   these negotiations, EA reiterated its position to Edge Games that there was no likelihood of

16   confusion between "Mirror's Edge" and the "EDGE" marks purportedly owned by Dr. Langdell.

17   The talks ended in July 2009 without an agreement (Schatz Decl. ¶ 13).  EA did not receive

18   another communication from Dr. Langdell until March 2010, shortly after EA had announced the

19   release of "Mirror's Edge" for the Apple iPad and iPhone.  In this communication, Dr. Langdell

20   once again called upon EA to cease using the "Mirror's Edge" name.  EA did not respond to the

21   email, and had no further interactions with Dr. Langdell until this action was filed three months

22   later (*id.* at ¶¶ 14–15).

23                                    *                    *                    *

24

25

26          [5] Dr. Langdell did *not* attach to his declaration any copies of these "numerous letters" that were
     supposedly sent to EA in January, March, May, July, and September 2008.
27

28          [6] In fact, that separate action, in which Velocity Micro filed suit against Dr. Langdell's companies in
     the United States District Court for the Eastern District of Virginia, ended pursuant to a confidential settlement
     agreement.

1    Edge Games filed this action on June 15, 2010 (Dkt. No. 1).  Nearly two months passed

2    without any motions being filed.  Finally, on August 20, over 21 months after EA first began

3    selling the "Mirror's Edge" video game to the public, the instant preliminary injunction motion

4    was filed (Dkt. No. 16).  This order follows a hearing held on September 30.

**ANALYSIS**

6         A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on

7    the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the

8    balance of equities tips in his favor, and that an injunction is in the public interest.  *Winter v.*

9    *Natural Resources Defense Council*, ---- U.S. ----, ----, 129 S.Ct. 365, 374 (2008).  As explained

10   below, plaintiff Edge Games has failed to establish — based upon the preliminary injunction

11   record detailed herein — that any of these factors weigh in its favor.

**1.    LIKELIHOOD OF SUCCESS ON THE MERITS**

13        To prevail on its claim of trademark infringement, Edge Games "must demonstrate that it

14   owns a valid mark, and thus a protectable interest."  *Lahoti v. VeriCheck, Inc.*, 586 F.3d 1190,

15   1197 (9th Cir. 2009) (citation omitted).  If ownership of such a mark is established, Edge Games

16   must then show that EA's "use of the mark 'is likely to cause confusion, or to cause mistake, or to

17   deceive.'"  *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 408 F.3d 596, 602 (9th

18   Cir. 2005) (quoting 15 U.S.C. 1114(1)(a)–(b)).

**A.    Trademark Validity**

20        On the issue of whether plaintiff has sufficiently demonstrated that it owns a protectable

21   interest in the asserted "EDGE" marks, the preliminary injunction record speaks for itself.  As

22   detailed above, the record contains numerous items of evidence that plaintiff wilfully committed

23   fraud against the USPTO in obtaining and/or maintaining registrations for many of the asserted

24   "EDGE" marks, possibly warranting criminal penalties if the misrepresentations prove true.  If

25   EA's evidence is credited, such fraud could (and likely would) strip these registered marks of

26   their "presumption of validity."  *See Tie Tech, Inc. v. Kinedyne Corp.*, 296 F.3d 778, 783 (9th Cir.

27   2002).  These misrepresentations also support EA's argument that many (if not all) of plaintiff's

28   marks have been abandoned, which would also render them invalid.

**United States District Court**
For the Northern District of California

17

Additionally, EA has put forth substantial evidence calling into severe question many of the representations made by Dr. Langdell in his declaration submitted to the Court.  Indeed, the declarations provided by EA from two of plaintiff's supposed "licensees" — Marvel Entertainment and Future Publishing — revealed that many of Dr. Langdell's assertions in his declaration were materially misleading or downright false.  These falsehoods infect all of Dr. Langdell's assertions regarding the bona fide and continuous use of the asserted marks in commerce and the purported "sales" of his company's video-game products.  In other words, all of his representations have become highly suspect in light of the evidence presented by EA.  They cannot be credited to justify the extraordinary relief requested herein.

In sum, based upon the evidence in the record, this order finds that plaintiff has not demonstrated a likelihood of success in proving that the asserted marks are valid.  *See Tie Tech,* 296 F.3d at 783; *see also* 15 U.S.C. 1127 ("Nonuse [of a mark] for 3 consecutive years shall be prima facie evidence of abandonment.  'Use' of a mark means the bona fide use of such mark made in the ordinary course of trade, and not made merely to reserve a right in a mark.").  Since a valid trademark is a prerequisite to a finding of infringement, Edge Games has failed to establish that it is likely to succeed on the merits.

## B.    Likelihood of Confusion

Even if the asserted marks were presumed valid and protectable, the preliminary injunction record does not support a likelihood of confusion between the asserted and accused marks.  As such, Edge Games has not established that it is likely to succeed on the merits.

To determine whether a "likelihood of confusion" exists, this order must examine the eight factors set forth in *AMF Inc. v. Sleekcraft Boats*:  (1) strength of the mark, (2) proximity of the goods, (3) similarity of the marks, (4) evidence of actual confusion, (5) marketing channels used, (6) type of goods and the degree of care likely to be exercised by the purchaser, (7) defendant's intent in selecting the mark, and (8) likelihood of expansion of the product lines.  *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348–49 (9th Cir. 1979); *One Industries, LLC v. Jim O'Neal Distributing, Inc.*, 578 F.3d 1154, 1162 (9th Cir. 2009)

United States District Court

For the Northern District of California

The preliminary injunction record and the *Sleekcraft* factors do not support a finding that a "reasonably prudent consumer" in the marketplace is likely to be confused as to the origin, endorsement, or approval of the competing products herein.  Indeed, the majority of plaintiff's arguments on this issue are tainted by the suspect evidence set forth in Dr. Langdell's declaration.  For example, according to Dr. Langdell, Edge Games is currently selling (or plans to sell) numerous "EDGE"-branded video games for modern gaming consoles through the exact same retail channels used by EA to distribute "Mirror's Edge."  The evidence to support this assertion — beyond Dr. Langdell's bare statements in his suspect declaration — is paper thin.  Indeed, Dr. Langdell never states exactly how much capital he has invested in developing, marketing, and selling his company's current and future video-game products.  Given that "Mirror's Edge" was marketed with significant monetary investments through sophisticated, high-profile channels, including pre-announcements and demonstrations at major industry events, and was sold by *major* retailers, plaintiff has not established that the marketing channels used or the proximity of the goods in the marketplace support its claims of infringement.  Indeed, EA has produced compelling evidence that plaintiff's video-game products may not even be available for sale to consumers at all.

Additionally, there is no evidence in the record that EA chose to call it's product "Mirror's Edge" for any reason but to describe the visual and thematic aspects of the video game.  This conclusion is bolstered by the fact that the word "edge" in "Mirror's Edge" is used to modify the word "Mirror."  In this connection, the "strength" of plaintiff's asserted marks is also highly susceptible to attack.  Even if the "EDGE" marks were deemed "arbitrary," as plaintiff argues, there is no evidence of actual confusion (despite over 21 months of "Mirror's Edge" being sold to the public).  Moreover, plaintiff has failed to show that each of the asserted marks is confusingly similar to the "Mirror's Edge" mark or that purchasers of "Mirror's Edge" would exercise such a low degree of care as to be confused as to the publisher or developer of the competing products.[7]  Similarly, under plaintiff's "reverse confusion" theory of infringement, the record does not

---

[7]  The fact that the various asserted marks are not even visually similar to each other and that the EA and EA DICE marks are prominently displayed on "Mirror's Edge" advertising and packaging further reduces the likelihood of confusion (Opp. 22).

19

support plaintiff's claim that purchasers of its various "EDGE"-branded products (to the extent that any exist) would believe that they were associated with EA, EA DICE, or the "Mirror's Edge" franchise.[8]

Yet another failed argument is plaintiff's assertion that the various "EDGE" marks constitute a "family of marks" where confusion can be analyzed based upon a common element shared between them. On this issue, there is no evidence in the record showing that the purchasing public recognizes that the term "edge" in the asserted marks is indicative of a common origin of goods. By contrast, EA has produced evidence that the term "edge" is found in many registered trademarks and product names within the video gaming industry that are *not* owned or licensed by Edge Games (Opp. 20–21). Given this crowded field, the scope of protection (if any) that can be afforded to the asserted marks is limited. Finally, with respect to plaintiff's "EDGE" logo, EA has put forth convincing evidence that the logo itself was first used in commerce by *another* entity, Future Publishing, and that its appearance was recently altered to make it appear more "similar" to EA's "Mirror's Edge" logo (specifically, it was changed from blue to red).

In sum, under the *Sleekcraft* factors, plaintiff has not sufficiently shown that consumers are likely to be confused as to the origin, endorsement, or approval of any of the products at issue in this litigation.[9] For these reasons, Edge Games has failed to establish that it is likely to succeed on the merits.

## 2. IRREPARABLE HARM

Following the Supreme Court's decision in *Winter*, irreparable harm cannot be presumed — even for trademark actions. Rather, it is the plaintiff's burden to prove that "he is likely to suffer irreparable harm in the absence of preliminary relief." *Winter*, 129 S.Ct. at 374. In the context of preliminary injunctive relief, irreparable harm is established when a plaintiff is

---

[8] Reverse confusion occurs when a junior user engages in such extensive promotion of goods under a mark that the market is swamped, resulting in a likelihood that consumers will mistakenly believe the senior user's goods are associated with the junior user. "In a reverse confusion situation, rather than trying to profit from the senior user's mark, the junior user saturates the market and 'overwhelms the senior user.'" 3 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 23:10 (2006).

[9] This order is not bound by, and declines to defer to, determinations by the USPTO as to whether the asserted and accused marks are confusingly similar.

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1  unlikely to be made whole by an award of monetary damages or some other legal remedy at a

2  later date, in the ordinary course of litigation.  *See California Pharmacists Ass'n v.*

3  *Maxwell-Jolly*, 563 F.3d 847, 851–52 (9th Cir. 2009).  As explained below, plaintiff has failed to

4  meet this burden.

5      *First*, as stated in the prior section, the preliminary injunction record contains compelling

6  evidence that the asserted marks were fraudulently registered and/or have been abandoned by

7  plaintiff.  While a jury may ultimately find otherwise, this thunderstorm over the validity of

8  plaintiff's asserted marks tempers the likelihood of irreparable harm.  Indeed, without valid and

9  protectable marks, Edge Games cannot suffer *any* harm to its property rights due to EA's

10  continued use of the "Mirror's Edge" name.

11      *Second*, given the suspect nature of Dr. Langdell's representations to both the USPTO and

12  the Court concerning plaintiff's current and future sales and business activities, it is an open

13  question whether plaintiff's business activities legitimately extend beyond trolling various

14  gaming-related industries for licensing opportunities.  In this connection, plaintiff has not

15  adequately shown that the potential harm to the "EDGE" marks during the interim period between

16  the filing and resolution of this action could not be adequately remedied by legal damages.

17      *Third*, and most telling, it is undisputed that Edge Games waited over three years since

18  "Mirror's Edge" was first announced and 21 months since "Mirror's Edge" was first offered for

19  sale to the public before seeking a preliminary injunction.  Due to this unreasonable delay, the

20  bulk of the alleged "irreparable harm" to the asserted marks purportedly caused by the "Mirror's

21  Edge" franchise has already been done.  Edge Games has not shown why issuing a preliminary

22  injunction *now* would prevent any irreparable harm to its marks beyond the "harm" that has

23  already occurred.  The undisputed fact that plaintiff did not timely act to prevent the "Mirror's

24  Edge" franchise from inundating the market is *alone* sufficient to deny the instant motion.

25      For these reasons, this order finds — based upon the record presented — that Edge Games

26  has *not* demonstrated that it is likely to suffer irreparable harm absent preliminary relief.

27

28

### 3.   BALANCING THE EQUITIES AND THE PUBLIC INTEREST

Finally, the two remaining factors weigh heavily against granting the relief sought by plaintiff. *First*, for all the reasons already discussed in this order, Edge Games has *not* established that the balance of equities tips in its favor. All of its representations regarding the validity and use of the asserted marks are infected by evidence of deceit. Moreover, there is scant evidence that Edge Games has invested *any* amount of funds into the development of recent products and services bearing the asserted marks.

By contrast, EA has shown that it has invested millions of dollars into building and promoting the "Mirror's Edge" franchise. It now has millions of customers. While Edge Games could have sought a preliminary injunction prior to (or shortly after) sales of the original "Mirror's Edge" video game began in earnest, it did not. Instead, plaintiff waited 21 months to allow the "Mirror's Edge" franchise to develop and expand. During this delay, EA continued to create and release products carrying the "Mirror's Edge" name, including newly released versions of the video game for the Apple iPad and iPhone. Given this record, allowing Edge Games to obtain a preliminary injunction after allowing EA to invest in and develop the "Mirror's Edge" franchise over such a long period of time would be plainly inequitable and highly prejudicial to defendant. *See E-Systems, Inc. v. Monitek, Inc.,* 720 F.2d 604, 607 (9th Cir. 1983).

*Second*, Edge Games has not shown that the public interest typically associated with trademark infringement actions — avoiding confusion to consumers — would favor a preliminary injunction. Rather, as stated, plaintiff has not sufficiently established that consumers are likely to be confused or deceived by the products at issue.

                    *                    *                    *

For the foregoing reasons, this order finds that plaintiff has failed to establish that it is likely to succeed on the merits, that it is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in its favor, or that an injunction is in the public interest. As such, a preliminary injunction is not warranted under the factors set forth in *Winter*.

**CONCLUSION**

Based upon the findings and conclusions set forth herein, plaintiff's motion for a preliminary injunction is **DENIED**.

**IT IS SO ORDERED.**

Dated:  October 1, 2010.



WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE